## SANDERSON *v.* THE STATE.

[No. 20,952. Filed November 22, 1907.]

1. APPEAL.—*Briefs.*—*Waiver.*—Points not discussed are waived. p. 303.

2. HOMICIDE.—*Evidence.*—*Inferences.*—*Question for Jury.*—Where the evidence in a homicide case is of such character that it is capable of two inferences—one of guilt, the other of innocence—the question of which inference has been established, is for the jury. p. 310.

3. APPEAL.—*Weighing Evidence.*—The Supreme Court will not weigh conflicting evidence. p. 311.

4. HOMICIDE.—*Evidence.*—Evidence showing that the accused was a brother-in-law of deceased; that deceased's wife, the accused and his two half-brothers had numerous contentions with de-

ceased and on various occasions had assaulted him; that they had oppressed and threatened him; that deceased, with two pistol shots in his head, from a pistol of the same caliber as accused's, was found in a pond weighted with a stone taken from near deceased's house, at which point blood was found; that the chain fastening the stone to the body looked like one used by the wife, who was living apart from deceased; that such persons took no part in the search, making many incriminating admissions, and committing many suspicious acts, supports a verdict of guilty. p. 311.

5. EVIDENCE.—*Homicide.*—*Conspiracy.*—*Separate Crimes.*—On a trial for homicide, evidence of an assault upon deceased by a conspirator, while accused and such conspirator were engaged in forcibly taking hay from deceased, is admissible as against accused, especially where he acquiesced in such assault and assisted in the defense of such conspirator. p. 311.

6. SAME.— *Homicide.*— *Conspiracy.*— *Separate Crimes.*— *Motive.*—On a trial for homicide by conspiracy, evidence of a separate assault committed by one conspirator upon the deceased, in the furtherance of an alleged common design of depriving the deceased of his property, is admissible against the accused as tending to show the motive for the homicide. p. 312.

7. SAME.—*Homicide.*—*Conspiracy.*—*Acts of Co-conspirators.*—After *prima facie* proof of a conspiracy, evidence of the separate acts of the conspirators is admissible as against the one on trial. p. 313.

8. SAME.—*Conspiracy.*—*Circumstantial Evidence.*—A conspiracy may be established by circumstantial evidence. p. 313.

9. SAME.—*Conspiracy.*—*Acts of Conspirators.*—Where a conspiracy is formed to do an unlawful act, or to do a lawful act by unlawful means, the separate acts of the conspirators are admissible in evidence against one or all of such conspirators. p. 314.

10. SAME.—*Admission.*—*Harmless.*—The admission of incompetent evidence, where harmless, is not ground for a reversal. p. 314.

11. APPEAL.—*Right Result.*—*Technicalities.*—Where a right result is reached, technical errors will be disregarded. p. 315.

From Wells Circuit Court; *C. W. Watkins,* Special Judge.

Prosecution by the State of Indiana against Ernest Sanderson. From a judgment of conviction, defendant appeals. *Affirmed.*

*Jay A. Hindman* and *Eichhorn & Matlack,* for appellant.
*James Bingham,* Attorney-General, *E. M. White, H. M. Dowling* and *A. G. Cavins,* for the State.

JORDAN, J.—Appellant, together with Otto Cook, William

Cook, Samuel Emery, Ollie Sanderson and Clara Smith, was charged by an indictment returned by a grand jury of Blackford county with having at said county, on October 23, 1904, "feloniously, purposely and with premeditated malice, killed and murdered one Edward P. Sanderson" by shooting and mortally wounding him with a certain revolver then and there loaded. Upon arraignment each of the defendants pleaded not guilty. Upon applications a change of venue was granted from the Blackford Circuit Court, and the cause was transferred to the Wells Circuit Court. In the latter court appellant was tried separately and apart from his codefendants. On October 4, 1905, the cause was submitted to a jury, and the latter, after hearing the evidence, the argument of the respective counsel, and the instructions of the court, retired to the jury room on October 18, 1905, and on the same day returned into court a verdict, finding appellant guilty of murder in the second degree, and assessing his punishment at imprisonment in the state prison for life. Over his motion for a new trial, assigning various reasons, judgment was rendered upon the verdict. From this judgment he appeals, and the only error which he assigns is the overruling of his motion for a new trial.

The only points discussed and relied upon by his counsel for reversal are, (1) that the judgment is not sustained by sufficient evidence; (2) that the court erred in the admission of certain evidence. In the motion for a new trial 185 separate grounds are assigned. The first three of these are that the verdict is contrary to law, contrary to the evidence, and is not sustained by sufficient evidence. The reasons numbered from four to nine, inclusive, challenge certain instructions, but these grounds are not discussed and, therefore, must be considered as waived. The remainder of the reasons assigned, numbered from ten to one hundred eighty-five, inclusive, relate to the competency of evidence offered by the State and admitted by the court over the objections and exceptions of

appellant. This evidence was introduced to show particular acts and declarations of appellant's codefendants William and Otto Cook and Ollie Sanderson made before the commission of the crime, and also acts of William and Otto Cook occurring subsequently to the murder of Edward P. Sanderson. It appears to have been the theory and contention of the State at the trial, and also in this appeal, that the above-mentioned codefendants and appellant had conspired together for the purpose of securing control and permanent possession of the property owned by the deceased, and that this conspiracy resulted in the perpetration of the murder. The evidence upon which the accused was convicted in part is circumstantial and in part consists of admissions or declarations made by him.

The evidence in the record is long and the circumstances in the case are many and minute. Therefore it would be impracticable in this opinion to give a complete statement of the testimony given upon the trial. We, however, note some of the facts which there is evidence to establish. Edward P. Sanderson was murdered at Blackford county, Indiana, on the night of October 23, 1904, about 9 o'clock. At the time of his death he was forty-six years old, a farmer owning considerable property, and residing on a small farm, which he owned, near Hartford City. As a matter of history connected with the case, it is shown that his father, Lemuel Sanderson, who died some years prior to the murder of his said son, sometime after the death of the mother of Edward P. married a Mrs. Cook, a widow. Appellant was a child by this marriage and a half-brother of the deceased. At the time of Mrs. Cook's marriage to Lemuel Sanderson she had three children, the fruits of a former marriage. These children were Ollie, William and Otto Cook, all three of whom are codefendants in this action. Ollie Cook married a Mr. Smith. Clara Smith, one of the codefendants, is a daughter by that marriage. Upon the death of Mr. Smith his widow married the deceased, Edward

P. Sanderson, and was his wife at the time of his death.
For about four years prior to the winter of 1903-4 Ollie
Sanderson resided in Hartford City, separately and· apart
from her husband, Edward P. Sanderson, who resided on
his farm. She occupied property in Hartford City owned
by her husband. Sometime in 1904 she and her two children
moved from Hartford City to the home of her husband.
Subsequently she left him and moved to her own farm of
about forty acres, situated within a mile of the premises
where the deceased resided at the time of his death. Appel-
lant for a period lived with the deceased and his said wife,
Ollie, and there is evidence going to show that during this
time he and Ollie, his half-sister, each entertained an ill
feeling toward the deceased. In fact it is shown that the
latter was opposed to appellant's living at his home, for
the reason that he and said Ollie were conducting matters
about the home and farm as they pleased, and were insist-
ing on selling property belonging to him. Sometime about
the middle of April, 1904, when ill feeling existed on the
part of appellant against the deceased, arising by reason
of and in respect to the sale of property, as hereinafter
shown, appellant, in a conversation with a witness who testi-
fied at the trial, said that Pres. Sanderson, meaning the de-
ceased, did not want him to remain at his house, and that
if he did "not quit acting the d—— fool because I am stay-
ing there, we are going to do him up." In the same month
Ollie Sanderson, the wife, desired to sell some hay belong-
ing to the deceased. The latter was using this hay to feed
the stock on his farm, and he objected to its sale. Appellant
and Otto Cook undertook to haul the hay to market and sell
it. To this the deceased objected. As a part of the same
transaction Otto Cook assaulted and beat the deceased, for
which offense he was arrested and prosecuted before a jus-
tice of the peace, and a fine was assessed against him. Ap-
pellant, together with William Cook and Ollie Sanderson,

attended the trial in the interest of Otto.  After assaulting and beating the deceased the parties, including appellant, appear to have hauled the hay to Hartford City and sold it, over objections of the deceased, and upon returning from town after its sale appellant cursed the latter and dared him to come out of the house, declaring that he would beat his "head off."

In April, 1904, Mr. Huffman went to see the deceased in regard to purchasing from him a steer.  Appellant was present at the time and would not allow the animal to be sold, and on that occasion he said, "Pres.," meaning Edward P. Sanderson, who was generally called Preston, "has got to support us."  In May following, the deceased was plowing a field belonging to Walter Ayers, using his own team for that purpose.  Ollie Sanderson, William and Otto Cook came to where he was at work for the purpose of taking from him the horses with which he was doing the plowing.  They appear to have failed in their mission, but in the afternoon they returned, and then unhitched the horses from the plow, and by force took possession of them, hitched them to a wagon, and hauled certain household goods owned by Ollie Sanderson to her own house, situated on her farm a short distance from the home of the deceased, where she then resided.  At the time William and Otto Cook unhitched the horses and took possession of them, and as part of the same transaction, William Cook assaulted the deceased, knocked him down and severely injured him.  On this occasion, in addition to taking from the home of the deceased the household goods, they also took chickens, cattle, horses and other property which belonged to the deceased, and which at that time were on his farm.  About October 21, 1904, William Cook received information that the deceased intended to institute an action to replevy this property from Ernest Sanderson, William Cook, Otto Cook and Ollie Sanderson.  On receiving this information William Cook declared that he would go and "do up" the de-

ceased. On the Saturday night preceding the murder, William Cook returned from Hartford City, and went immediately to Ollie Sanderson's home, which was in the vicinity, as heretofore shown, of the premises upon which the deceased then resided. Appellant met William at Ollie's house on the morning of the day of the homicide, and the two appear to have spent the day together in consultation.

Early in the month of October, 1904, appellant loaned his 32-caliber pistol to a Mr. Emory, who was a near neighbor of Ollie Sanderson. A few days prior to the homicide appellant called upon Emory and obtained this pistol. The murder, as previously said, was perpetrated on Sunday, October 23, about 9 o'clock at night, and on the following morning blood was discovered near a culvert on a highway at the foot of a hill, known as Patterson's hill, in the neighborhood of the houses of the deceased and Ollie Sanderson. On October 31, 1904, about noon, the dead body of the deceased was found in a pond known as Croninger's pond, which is just east of Hartford City, and about two miles from the house where the deceased resided at the time of his death. There was a strap around the neck of the body, and a stone weighing about sixty-eight pounds was fastened to this strap with a halter chain. A witness on the trial testified that this chain looked like the same chain that he had seen in use at Ollie Sanderson's home to hitch horses. The body was taken from the southeast part of the pond at a point about one and one-half squares east of the Lake Erie depot, at Hartford City, and near the public highway running east and west. It was four feet from the bank, and was under about eighteen inches of water, and when discovered there were two gunshot wounds near the right temple and two scalp wounds on the back of the head. Both of the gunshot wounds were made by pistol balls and the wounds on the back of the head were made by some heavy, blunt instrument. The gunshot wounds were made by balls from a 32-caliber revolver. Both of the

balls penetrated the skull into the brain. Either of these wounds would have produced instant death. At the inquest held upon the body it was found that the lungs and other organs were in normal condition and that the lungs contained no water, which, as witnesses testified, indicated that the deceased did not breathe after his body was thrown into the pond.

On Sunday, the day of the murder, appellant and William Cook ate supper at the home of Ollie Sanderson, at which place they appear to have met on that day. After supper, they left the house, and there is evidence tending to show that they did not return to Ollie's house before 9 o'clock on that night. Witnesses testified at the trial that they heard two shots fired about 9 o'clock on the Sunday night in question. These shots were in the direction of the house where the deceased lived, and were fired in quick succession. In addition to the blood found at the foot of the hill, there were drops of blood also found along the way leading from the point where blood was first discovered to Croninger's pond. About 9 o'clock in the forenoon of the day upon which the corpse of the deceased was discovered, but before it was found, appellant was seen sitting on a porch in front of the Lake Erie saloon in Hartford City. He remained there for about one hour, and then walked over to the Lake Erie depot, and stood looking towards Croninger's pond. Beginning with Tuesday after the murder, William Cook did no work during that week, but on each day he was seen to go to the highway running past Croninger's pond and look at the pond. Appellant took no part in the search that was made to find the body of the deceased; neither did Ollie Sanderson nor William nor Otto Cook. On the morning of the day upon which the body was found, but sometime prior thereto, Wright Peck met appellant and had a conversation with him at Hartford City. Peck inquired what he was doing, and appellant responded that he was not doing anything; said he could not work;

that he did not feel like working; that he was bothered or troubled and uneasy; and further stated, in the same conversation, that if Pres., meaning the deceased, was found dead, Will Cook was gone.

There is evidence to show that the stone which was attached to the body of the deceased had been taken from the highway near the foot of Patterson's hill, where the blood heretofore mentioned was found. Edward P. Sanderson worked at the home of Walter and Clara Ayres on Saturday, October 22, leaving for his own house, which was about a quarter of a mile away, between 5 and 6 o'clock, and spent the night at his own house. A light was seen at his window. There is evidence to show that he was about his home on Sunday. He was there as late as 8 o'clock Sunday, October 23, for a light was seen in his kitchen by certain persons who testified at the trial. The deceased, on the date of the murder, was living alone. A short time after the finding of the body, appellant and his half-brothers Otto and William Cook met the sheriff of Blackford county at a saloon in Hartford City and requested that official to protect them against any violence on the part of the people, which he did by confining them in the jail. There is evidence going to show that appellant was in the immediate neighborhood of the home of the deceased during the Sunday evening in question. On that evening it also appears that he had in his possession a 32-caliber revolver, the one which he had loaned to Mr. Emory, as hereinbefore stated.

Charles Kingsbury, who was confined in the jail at Hartford City with appellant, on the trial testified that at a time when he and appellant were alone in the jail they had a conversation about breaking jail. The following is the material part of the evidence which this witness gave:

"Q. At a time when you and Ernest [meaning appellant] were alone, you may tell the jury whether or not you had a conversation with him relative to breaking out of jail.

A. Yes, we had a short conversation in regard to that.

Q. Tell the jury what you said to him and what he said to you.

A. Well, we were talking about breaking out of jail. In the first place, talking about getting in there; about having been arrested and put in there. I said I was in there for something I hadn't done, but I expected they would convict me because the evidence was strong against me. If I could get out without hurting anybody, and get away, I believed I would go. Well, he said, he didn't know whether he wanted to go or not. He said the women folks [meaning Ollie Sanderson and Mrs. Smith] were upstairs in a separate part, and Otto and Bill [meaning Otto and William Cook] were over at Bluffton [in jail], and if he would get out then it would show they were guilty, and he says, 'By me staying, too, and all going together, probably they could get out of it.'

Q. What further was said, Mr. Kingsbury?

A. I asked him what he would do if he got convicted, and he said he had his revenge anyhow; and I looked around and I says 'You do not mean to say that you killed him?' 'No,' he says, 'but I helped to.' "

In addition to the facts which we have considered necessary to set out in our opinion, there are a number of other circumstances shown tending to prove facts favorable to the side of the State. The latter, however, in this case is not compelled to rely solely upon the circumstantial evidence, for, in addition to the numerous circumstances which point to the guilt of the accused, there are his own positive admissions to establish his guilt. But, did his conviction rest alone upon the circumstantial evidence appearing in the case, we would not be justified in asserting that it is not of such a character that two inferences might be reasonably deduced therefrom, one supporting the guilt of the accused and the other favorable to his innocence. In *Lee*

v. *State* (1901), 156 Ind. 541, this court said: "Where the circumstantial evidence in a case is of such a character that two conflicting inferences may be reasonably drawn therefrom, one favorable to or tending to prove the guilt of the accused, and the other favorable to his innocence, then, under such circumstances, it is not within the province of this court to determine which inference ought to have controlled the jury. The question in such a case manifestly becomes one of fact for the decision of the jury, subject to review by the trial court, and is not, as previously said, open to review on appeal." See *Deal* v. *State* (1895), 140 Ind. 354; *American Varnish Co.* v. *Reed* (1900), 154 Ind. 88.

It is not our province to weigh the evidence in a case on appeal. This rule applies whether the evidence be direct or circumstantial, or both. *McCaughey* v. *State* (1901), 156 Ind. 41; *Knox* v. *State* (1905), 164 Ind. 226, 108 Am. St. 291; *Williams* v. *State* (1905), 165 Ind. 472, 2 L. R. A. (N. S.) 248.

But counsel for appellant, however, argue that we should reverse the judgment upon the evidence alone. In answer to this contention it can be said that there is so much evidence in the record going to show the guilt of appellant that to disturb the judgment thereon would be wholly unwarranted. We are satisfied that the jury was fully warranted in finding appellant guilty.

Counsel for appellant argue that the trial court erred, to the prejudice of appellant, in permitting the State to prove that William and Otto Cook assaulted and beat the deceased upon the two occasions shown in our statement of the evidence. At the time Otto Cook perpetrated the assault during the difficulty which arose over taking away the hay of the deceased, appellant was present, aiding William and Otto Cook in attempting to obtain possession of the hay. While he was not an active participant in committing the assault, nevertheless he apparently acquiesced

therein, and was present in the interest of Otto Cook before a justice at the time he was being prosecuted for the offense in question. Under the circumstances, therefore, he is not in a position successfully to complain of the admission of evidence in respect to the assault in question, which appears to have occurred as a part of the transaction of taking possession of the hay. It is true that appellant was not present at the time when William Cook struck and beat the deceased, which occurred at the time said Cook was attempting to take forcible possession of the horses of the deceased which were being used by the latter in plowing. The admission of the evidence in regard to this assault and battery is not, as counsel contend, permitting the State to establish the commission of one crime by proving another offense. The conspiracy or common design wrongfully to obtain the property of the deceased was then pending, and the acts of the alleged co-conspirators on that occasion, as claimed by the State, may be said to have been in furtherance of such common design, or, at least, were a part of the active prosecution thereof. Again, it was competent for the State to show the motives which prompted appellant and his co-conspirators to commit the murder. The theory of the State is that appellant and his co-conspirators were each and all actuated by the same motives in the perpetration of the crime, viz., ill or revengeful feelings which they entertained against the deceased. The tendency of the evidence in controversy, when considered together with other evidence and circumstances in the case, was to prove such motive on the part of appellant and his co-conspirators. *Clem* v. *State* (1870), 33 Ind. 418, 429. The rule is well recognized that collateral crimes may be shown where they tend to prove malice or motive, if such elements enter into the offense charged against an accused person. Gillett, Indirect and Collat. Ev., §57.

Again, it may be said, we think, that the two assaults made by the Cooks appear from the evidence to have been

a part of a system of conspiracy to secure possession of the property of the deceased. In respect to the rule applicable in conspiracy cases, when the acts of a conspirator form a part of a system of the conspiracy in question, this court, in *Card* v. *State* (1887), 109 Ind. 415, quoted with approval the following from Wharton, Crim. Ev., §32: " 'Conspiracy cases give signal illustration of the rule here stated. The acts of each conspirator emanate from him individually, yet when they are part of a system of conspiracy they are ·admissible in evidence against his co-conspirators, although each component act may .constitute an independent offense. The reason for the rule in this and in similar cases is that when once system is proved, each particular part of the system may be explained by the other parts which go to make up the whole.' "

The trial court, in admitting the evidence of which appellant complains, manifestly was satisfied that there was a sufficient *prima facie* showing of the existence of a 7. conspiracy upon the part of appellant, the two Cooks and Ollie Sanderson, and upon this theory held the evidence to be competent as being in furtherance of such conspiracy. *Walton* v. *State* (1882), 88 Ind. 9; *Williams* v. *State* (1874), 47 Ind. 568; Gillett, Crim. Law (2d ed.), §311; *Musser* v. *State* (1901), 157 Ind. 423.

We cannot say that in so holding the court abused its discretion, for there is evidence tending to show that the State had at least made a *prima facie* case of the con- 8. spiracy. In fact, as the authorities affirm, a conspiracy may be inferred from the circumstances proved in the case. In order to prove that the accused person conspired with others, it is not essential to establish by direct evidence that he entered into the unlawful agreement or conspiracy. *Archer* v. *State* (1896), 106 Ind. 426; Gillett, Crim. Law (2d ed.), §311; *Musser* v. *State, supra.*

In the case last cited this court sustained, as a correct exposition of the law, the following statement: " 'Evidence

in proof of conspiracy will generally be circumstan-
tial, and it is not necessary for the purpose of show-
ing the existence of the conspiracy for the State to
prove that the defendant and some other person or persons
came together and actually agreed upon a common design
and purpose, and agreed to pursue such common design and
purpose, in the manner agreed upon. It is sufficient if such
common design or purpose is shown * * * by circum-
stantial evidence.' " The general rule or doctrine asserted
and sustained by the authorities is that where persons have
conspired together to commit an unlawful act or to commit
an act, although not unlawful in itself, but by means which
are unlawful, the acts and declarations of any of the persons
entering into such conspiracy done or made during the ex-
istence or pendency thereof, and in the furtherance of the
common design or purpose, are original evidence against any
or all of the other coconspirators. *Wolfe* v. *Pugh* (1885),
101 Ind. 293; *Card* v. *State, supra; Musser* v. *State, supra;*
Gillett, Crim. Law (2d ed.), §311.

The basis of the rule upon which such evidence is ad-
mitted is that, where a combination of persons has been
formed for an unlawful purpose, they may be said to have
assumed an individuality in respect to the purpose or de-
sign in question, and the acts of each are by law chargeable
to all of such co-conspirators. 3 Ency. Ev., 417; Gil-
lett, Indirect and Collat. Ev., §28; Gillett, Crim. Law
(2d ed.), §311; *Card* v. *State, supra; Wolfe* v. *Pugh,
supra; Musser* v. *State, supra.*

We conclude, for the reasons given, that the evidence in
question was competent.

Counsel for appellant further complain of the admission
of certain other evidence tending to show the acts or con-
duct of William and Otto Cook and Ollie Sander-
son prior to the commission of the murder, and also
certain acts or conduct of William and Otto Cook
subsequently thereto, but before the body of the deceased

was discovered. The contention of the State in regard to this evidence is that it was admissible under the rule affirmed in *Musser* v. *State, supra*, and the authorities therein cited, but as to whether the State is correct in its contention in this respect we need not and do not determine, for the reasons hereinafter stated. Objections are also advanced relative to the admission at the trial of evidence other than that above stated. We pass, without deciding, the questions so raised, for the reason that we are satisfied that the admission of the controverted evidence was harmless and in no manner operated to the prejudice of the substantial rights of appellant, hence affords no grounds for reversal. *Binns* v. *State* (1879), 66 Ind. 428.

The evidence in dispute, as we view it, is not of importance, nor influential in its character. Hence it may be presumed that it in no manner exerted a controlling influence over the verdict of the jury. If the particular items of which appellant complains had been excluded or eliminated, it is apparent, in view of the remaining evidence, that the jury could not have done otherwise in the discharge of its duty than to convict appellant. The case from our view, under the facts and the instructions of the court, was fairly tried and determined upon its merits.

11. Under §2221 Burns 1908, Acts 1905, p. 584, §334, we are required to disregard "technical errors or defects, or exceptions to any decision or action of the trial court," which, in our opinion, do not prejudice the substantial rights of the defendant. As we find no such error presented by the record, the judgment is affirmed.