HICKS *v.* STATE OF INDIANA.

[No. 26,849. Filed November 24, 1937. Rehearing denied February 1, 1938.]

Virgil J. McCarthy, Stephens L. Blakely, and Owen S. Boling, for appellant.

Omer S. Jackson, Attorney-General, Glen L. Steckley, Deputy Attorney-General, and Charles A. Lowe, for the State.

HUGHES, J.—The appellant was indicted, tried, and convicted for the murder of Harry R. Miller. He, together with William Kuhlman, Frank Williams, and John Poholsky were indicted in five counts, and he was found guilty on the third count which charged murder in the first degree and the death penalty was fixed as his punishment. The other three co-defendants pleaded guilty to the charge contained in the third count, were sentenced to death and have been duly electrocuted. The appellant alone entered a plea of not guilty and stood trial although the evidence clearly shows that he was the instigator of and took part in the murder.

The murder occured on the night of the 11th day of June, 1936, at the home of the deceased near the town of New Trenton in Franklin county, Indiana. All four of the defendants were former convicts and some of them had served several prison sentences. The deceased, Harry R. Miller, was a man of considerable wealth. He lived near New Trenton. He had a sister, Flora Miller, an eccentric woman, age sixty-six years, who lives in Cincinnati. The evidence shows that she at one time had considerable wealth, but had largely dissipated it. The appellant had been in the employment of Miss Miller since 1934, as chauffeur and doing other kinds of work for her. The evidence shows they were on very friendly terms.

It is shown by the evidence that the appellant by some means had secured some bonds and stocks belonging to the deceased, Harry Miller, prior to the murder on the night of June 11, 1936, and it is apparent that one of the motives for the murder was the belief on the part

of the appellant, Hicks, that if the deceased, Harry R. Miller, was dead, his sister Miss Miller, would inherit his property and that he would be able, either through friendship or otherwise, to appropriate part of the Miller property to himself. This motive is given by Hicks in his confession.

Whatever the motive may have been, the evidence clearly shows that the appellant, Hicks, for several weeks before the murder was committed began to make plans for its perpetration. All of the perpetrators were living in Cincinnati and saw one another frequently. Hicks was cautious in proposing his plan to his associates and conspirators. He talked to them individually and as a group as to a murder he proposed to commit and finally agreed to the sum each would receive and as to the part each would perform in the murder. Shortly before the murder was committed he told them the name of the party and all of the defendants on June 4th prior to the murder drove at night to the home of the deceased for the purpose of killing him but he was not at home. It was on June 4th that all four of the men met at 30 N. Court street, Cincinnati, and planned the murder, and then drove down to Miller's home at about 10:30 p. m. to murder him, but when they found that he was not at home they returned to Cincinnati. On the following Monday they met at Kuhlman's apartment, Morrison street, Cincinnati, and discussed their plans and decided to return to Miller's on June 11th. Hicks said this would be the best time for him as he could then establish an alibi by taking Miss Miller to the show. They met at this place several times. On the night of June 11th all the men went to Kuhlman's apartment and left there for Miller's and arrived there about 10:30 p. m. They went in an automobile which had been stolen by Kuhlman. When they arrived at Miller's, Hicks told the other men to remain in the car.

Hicks had written a letter to Miller to be at home that night as he was bringing some whiskey men to see him. As the party went through Harrison, Hicks purchased some whiskey. After Hicks went into the house he called for Williams and Kuhlman. They then went up to the house. Poholsky remained in the car for the time being. Miller was in his kitchen seated in a chair by the table. Hicks passed some drinks around. Kuhlman then hit Miller on the head with a lead pipe. Miller jumped up and ran to the front porch. Williams and Kuhlman were wrestling with Miller when Poholsky came up. Miller fell on the porch and Poholsky struck him several times on the head with the lead pipe. Hicks ran into the house and secured a towel and sweater and he and Poholsky wrapped the towel and sweater around Miller's head. He was unconscious and there was a great amount of blood on the porch. The four men picked Miller up and carried him to the car and put him in it between the front and rear seat. He was a very large man, being over six feet and weighing about 250 pounds. Miller was covered with a tent to prevent anyone from seeing him. After Miller was placed in the car, Kuhlman, Williams, and Poholsky got in the car. Hicks remained at the home of Miller to clean the blood from the porch and also to straighten up the house. This was all prearranged and Hicks was to take Miller's car to Cincinnati which the evidence shows that he did. The three who were in the car drove down toward Madison and to a place located across the river from Warsaw, Kentucky. They gave a signal for the ferry to take them across, but just at that time Miller started groaning and they turned around and drove up the road towards Madison. Kuhlman then took his revolver and shot Miller three or four times. They drove to Madison, crossed the river into Kentucky, and went through Carrollton. Near this place the body was taken out of the car and Poholsky

with a meat cleaver and axe which they had with them cut off Miller's head and hands. They were placed in a cardboard box with cement and placed in the trunk of the car. The body was thrown in the car and taken to a place below Eminence, Kentucky, where it was put under a culvert. The clothing was all taken off the body, lime was poured over it and covered with rocks. They then drove back toward the Ohio river and put the box containing the head and hands into a pond or lake by the side of the road. From this place they drove to Cincinnati on the Kentucky side of the river. They went to Kuhlman's apartment on Morris street. This was about 10:00 a. m., June 12th. About 2:00 p. m. Hicks came to the apartment where he met the other three. Hicks was told where the body, head, and hands were and that Kuhlman shot Miller.

Hicks had agreed prior to the murder to pay Williams, Kuhlman, and Poholsky $6,000.00 for the part they were to play. On the evening of the murder he gave them some money for expenses. After the murder he gave them 100 shares of Bethlehem Steel. He told them that it was part of the stock that he had taken from Miller's safe located at his sister's home. Hicks had agreed to pay in cash, but he told them he could not make connections to sell the stock and bonds which he had; Kuhlman and Williams took the Bethlehem Steel stock to Cleveland and through other parties, received $2,500.00.

The evidence discloses that the head and face of Miller had been badly beaten, bruised, and crushed. The nose was broken off and was barely attached to the face. The forehead was mashed and crushed in. There was a hole in the temple and one practically between the eyes about the size of a dime.

A Mr. Dunn lived near the pond or pool of water where the head and hands were found. He first found

an axe, fishing poles, and a match folder. There was also a large pool of blood on the bank and some cement and sand. Hicks and the other occupants of the car, when they went to Miller's house, had these fishing poles on the side of their car so that they might pose as fishermen. Two handkerchiefs and some pieces of cloth were also found. The match folder had the name of a Harrison concern on it. All of these objects were introduced in evidence. On June 28th some boys found a box in the pond or lake and called the sheriff of Carroll county, Kentucky. The sheriff and deputy, and Dr. D. C. Bakes went to investigate. He pulled the box out and opened it. A finger protruded from a square concrete block which was in the pasteboard box. The block was taken to the sheriff's office. The head could not be seen —it was entirely covered with cement and after being broken away the head was exposed. In addition to the other articles, a towel and tent or tarpaulin were found. Two holes were found in the towel.

The first two errors assigned in appellant's motion for a new trial are that the court erred in denying his motion and request to have removed from the court room four armed state policemen. It appears that these state policemen were stationed in the two rear corners of the court room and two in the front part of the court room. In addition to these four officers, the sheriff and deputy sheriff were in the court room. The motion was made before the introduction of any evidence and it was charged by the appellant that said officers created an atmosphere which might be prejudicial to the rights of the defendant. It is to be noted that it was not charged that the presence of the officers was prejudicial to the appellant, but that it might be. It is insisted by appellant that by permitting said officers in the court room, Section 13, Article 1 of the Constitution of Indiana, providing that the "Accused shall have the right to a public

trial by an impartial jury" was violated and also that Section 15, Article 1 of the Constitution of Indiana, providing that, "No person arrested or confined in jail shall be treated with unnecessary rigor." We fail to see where either of these sections were violated. The conduct of a trial is left largely to the discretion of the trial judge and in the absence of a clear abuse of discretion this court will not interfere. We must assume that the court had good reasons for having four members of the state police in addition to the sheriff and his deputy in the court room.

In opposition of the appellant's motion the State stated its reasons for the presence of the policemen. It was stated that two of the defendants were at large and had made threats that they were coming to Brookville where the trial was to be had and that the defendant Hicks had smuggled letters out of jail requesting persons to bring saws. Having knowledge of these facts and the fact that all four of the defendants were ex-convicts, the court deemed it necessary to take all precaution possible and permitted the officers in the court and stationed as above stated. We think no constitutional provision was violated in the action of the trial court and no error was committed in overruling appellant's motion. *Hall* v. *State* (1928), 199 Ind. 592, 159 N. E. 420.

The third error complained of by the appellant is that the court erred in permitting John Poholsky to answer the following question over appellant's objection: ▉▉ —"Did Kuhlman do anything at all before you cut the head and hands off?" for the reason that said statement was the statement of an alleged co-conspirator made after the consummation of the alleged conspiracy. The conspiracy in the instant case was not only to murder Harry R. Miller, but it was also to mutilate and dispose of the body after the murder. Therefore the declarations and acts of a conspirator during the existence of

the conspiracy and until it is completed are admissible against the co-conspirators. *Berry* v. *State* (1930), 202 Ind. 294, 165 N. E. 61; *Commonwealth* v. *Smith* (1890), 151 Mass. 491, 24 N. E. 677; *People* v. *Storrs* (1912), 207 N. Y. 147, 100 N. E. 730. There can be no question under the evidence in the instant case that part of the conspiracy was to mutilate and dispose of the body. This was just as much a part of the conspiracy as was the murder and the disposal of the body was in furtherance of the conspiracy. *Hamilton* v. *State* (1932), 205 Ind. 26, 184 N. E. 170; *Sanderson* v. *State* (1907), 169 Ind. 301, 82 N. E. 525.

We think the evidence of Poholsky as to what Kuhlman did in disposing of the body of Miller, although in the absence of Hicks, was competent and tending to show the acts of a co-conspirator in furtherance of the conspiracy.

It is next insisted that error was committed in permitting Exhibit 7, which was a photograph of the head and hands of the deceased, to be introduced in evidence. The exhibit was properly identified as a photograph of the head of the deceased. We can conceive of no reason why the exhibit was not admissible. Appellant cites no authority to sustain his contention. *State* v. *Williams* (1923), 195 Iowa 785, 192 N. W. 901; *Lundy* v. *State* (1920), 204 Ala. 492, 85 So. 821.

The appellant also insists that it was error for the court to permit the witness, Ernest Richardson, to testify as to the condition of some window screens at the Miller home on June 30, 1936. It was answered that the screen was bulged in. This evidence was unimportant and even if inadmissible its introduction in evidence would not be sufficient to reverse the case. *Chicago R. R. Co.* v. *Mitchel* (1915), 184 Ind. 383, 110 N. E. 215.

The appellant assigns as one error the refusal of the court to permit Matt Leach to answer the following ques-

tion: "Did she, (Miss Miller) tell you she had gotten such a letter?" At the time this question was asked evidence was being introduced before the court and out of the presence of the jury for the purpose of determining the admissibility of the confession of the appellant Hicks. The State objected to the question on the ground that it called for a conversation and line of examination that was not gone into by the State at any time on direct examination. On this ground as shown by the evidence the objection should have been overruled. However, conceding there was error in refusing witness to answer the question, it was harmless and could not effect the result of the ruling of the court on the admission of the confession. The evidence sought to be elicited from the witness could have had no bearing upon the question of the admissibility of the confession. The question involved was whether or not the confession was made under the influence of fear produced by threats, intimidation or otherwise and the evidence relative to a letter received by Miss Miller was entirely foreign to the confession.

Causes 17, 18, and 21 for a new trial are based upon the proposition that the court committed error in overruling the appellant's motion to exclude from the jury the confession (Exhibit 26) signed by Heber L. Hicks and in admitting the same in evidence.

The statement of the confession was taken at the Indiana Police State Barracks at Seymour, Indiana, on July 7, 1936, at 10:40 p. m. He was first told that "under the laws of the United States of America and the laws of the State of Indiana, you do not have to make any statement unless you see fit and any statement that you do make can be used either for or against you in court. This has to be of your own free will and volition." He was then asked if he was ready to make a statement and his reply was: "Yes, Sir." He then answered freely the

question put to him and his evidence was in substance as follows: That he had made definite plans relative to Harry R. Miller possibly six weeks before June 7, 1936, that he figured, "if he was out of the way that Miss Flora Miller would receive the estate and that I indirectly would benefit by it because of the fact that I was employed by Miss Miller"; that he contacted John Poholsky about his plan and asked if he would commit murder; that he then contacted Frank Williams and William Kuhlman; that he gave them about $30.00 on June 6th and talked to them at other times about the crime and told them to go ahead with the crime while he established an alibi with Miss Miller; he said he did not tell them where to take the body but he thought they would take it about 400 miles; that he had a talk with Kuhlman and Williams on June 12, 1936, and that they told him of the struggle at the house and how they put him in the automobile to take him away, that they told him the route they took with the body and about cutting off the head and hands; that he wrote a letter to Miss Miller which she received from Cleveland on June 19th and that Kuhlman and Poholsky mailed it. He said the letter contained the following: "Flora call Bill Myers and have him take care of my place until I return," signed Harry. He further said: "They took 100 shares Bethlehem Steel which was quoted on or after that date at 55 which would be worth $5,500." The foregoing is the substance of his statement and confession. It was signed by him and witnessed by four officers.

Section 9-1607 Burns 1933, §2263 Baldwin's 1934, provides:

"The confession of a defendant made under inducement, with all the circumstances, may be given in evidence against him, except when made under the influence of fear produced by threats or by in-

timidation or undue influence; but a confession made under inducement is not sufficient to warrant a conviction without corroborating evidence."

The evidence shows that the appellant Hicks was taken in custody July 2, 1936, and placed in jails at Brookville, Indianapolis, Danville, and Covington, Indiana, and police barracks at Rushville and Seymour; that he was moved from place to place by orders of Captain Leach of the State Police Department. Just why he was taken to so many places we do not know. Such action on the part of the police department may have been unnecessary and subject to criticism, but this fact alone would not justify the rejection of the confession. If the confession was not made under the influence of fear produced by threats or by intimidation or undue influence, then the fact that he was removed from place to place and held for a great length of time would not alone be sufficient to withhold the confession. *People* v. *Alexi* (1934), 265 N. Y. 192, 192 N. E. 289; *People* v. *Vinci* (1920), 295 Ill. 419, 129 N. E. 193. Neither does the fact that a defendant, at the time of making a confession, is held without any process or lawful right, require that it be rejected. *Balbo* v. *People* (1880), 80 N. Y. 484.

During the time Hicks was in jail in Danville and Covington and while he was traveling to and from these places and to Rushville he does not complain that he was mistreated in any way. He does, however, assert that while in Rushville and Seymour he was mistreated and threatened to such an extent that the statement or confession made by him was under the influence of fear produced by threats, intimidation, and undue influence. This was denied by all the State's witnesses. They all testified that he was not mistreated in any way and that he was never threatened or intimidated into making the confession. All of the witnesses who testified for the State were officers and employees of the

State except one—Joseph Garretson. He was a reporter on the Cincinnati Enquirer. He was present at the Rushville and Seymour barracks when Hicks was being examined. At the Rushville barracks he talked with Hicks on the porch, not about the case but about other things in general. When the officers were questioning Hicks, Garretson was not in the room, but he was on the outside, and as he says, "eavesdropping." He said the officer's manner of questioning was in "a temperate conversational tone," and that he heard no violence or threats of any kind toward Hicks. He said Hicks was perfectly calm and manifested no fear at all. Hicks also claims that he demanded the right to get an attorney at different times. This, the officers deny. The evidence given before the court and out of the presence of the jury as to the admissibility of the confession is conflicting. Hicks gives one version of it and the State's witnesses give another. In this condition of the record this court will not weigh the evidence introduced upon this issue of the case. As there was evidence to sustain the trial court's ruling it will not be disturbed.

We can not say there is no evidence to support the ruling of the trial court on the admissibility of the confession. As said in the case of *Anderson* v. *State* (1933), 205 Ind. 607, 616, 186 N. E. 316:

> "A confession, when offered in evidence against the accused, is *prima facie* admissible, and the necessity of showing its incompetency under the statute devolves upon him."

*State* v. *Laughlin* (1908), 171 Ind. 66, 84 N. E. 756; *Hauck* v. *State* (1897), 148 Ind. 238, 46 N. E. 127. The competency of the confession as evidence against the appellant was made an issue before the trial court for its determination. . . . This court is not authorized to weigh the evidence upon the question presented, nor attempt to reconcile any conflict therein, but, under a well settled

rule we are required to sustain the finding of the lower court." After the court has determined that a confession is competent and admissible and it is introduced in evidence, the defendant has the right to present to the jury evidence as to the conditions under which it was obtained, evidence that he did not make the confession, or evidence which tends to contradict, discredit, or lessen the weight of the confession or of any statement therein. 16 C. J. 737; *Mack* v. *State* (1931), 203 Ind. 355, 373, 180 N. E. 279.

> "A confession is evidence to be considered by the jury in determining the guilt of the accused, and such evidence may be rebutted the same as other evidence." *Mack* v. *State, supra.*

We are of the opinion that the court did not commit reversible error in permitting the admission of the purported confession.

The 24th reason assigned for a new trial is without merit and could not in any manner effect the final result of the trial.

The 27th reason for a new trial is that the court erred in refusing to permit the witness, Matt Leach, on cross-examination, to answer the question—"Will you tell the jury what that conversation was?" The conversation referred to was a conversation heard over a dictaphone between Flora Miller and Heber L. Hicks. It was not shown that the witness heard the conversation. He was merely asked if some one made a report to him of the character of the conversation by the State on this subject and no questions relating to it were asked the witness on direct examination. It is the general rule that a cross-examination must be confined to the subject matter of the examination in chief. When the direct examination opens on a general subject, the cross-examination may go into any phase of that subject, and can not be restricted to mere parts of a general and

continous subject which constitutes a unity. But when, as here, the direct examination did not open up the subject of the dictaphone conversation, it can not be gone into on cross-examination. There was no error in the court's ruling as to this question.

Cause No. 33 for a new trial was based upon alleged error of law in overruling appellant's motion made at the close of the state's evidence for a peremptory instruction for the jury to return a verdict for the appellant. After the motion was overruled appellant proceeded to introduce evidence in his behalf. This motion was properly overruled. As said in the case of *Bowen* v. *State* (1920) ,189 Ind. 644,651,120 N.E. 926,

> "The refusal of the trial court to give the jury a peremptory instruction in favor of the defendant at the conclusion of the state's evidence, is assigned as error. . . . However, by proceeding with the introduction of evidence after his motion was overruled, the defendant waived the motion."

See *Wukina* v. *State* (1920), 189 Ind. 535, 128 N. E. 435; *Kennedy* v. *State* (1935)., 209 Ind. 287, 196 N. E. 316.

The 40th reason assigned in the motion for a new trial is predicated upon the fact that the court overruled his motion made at the close of all the evidence for a peremptory instruction directing the jury to find the defendant not guilty under all of the counts of the indictment.

The theory of the motion of appellant for a directed verdict was that there was a variance between the charge in the indictment and the proof to sustain it. Appellant contends that as the indictment charged that the murder of Miller was committed with a blunt instrument and the proof showed that he was killed by a pistol shot, there was such a variance as to entitle him to an acquittal.

It is true that the general rule is that "in case the means by which the homicide was committed are alleged, the proof must correspond with the allegation, although

substantial correspondence is sufficient." 30 C. J. p. 134. *Gipe* v. *State* (1905), 165 Ind. 433, 75 N. E. 881; *Wagoner* v. *State* (1900), 155 Ind. 341, 58 N. E. 190. Conceding the foregoing to be a correct statement of the law, we believe that in the instant case the appellant is not within the protection of that rule of law.

The evidence clearly shows that a conspiracy was formed by Hicks, Kuhlman, Williams, and Poholsky; that pursuant to that conspiracy part of all of the conspirators struck Miller over the head with a blackjack and lead pipe several times, crushing in the forehead and practically severing his nose and causing him to become unconscious and in a dying condition. But the appellant says that after this was all done Miller was thrown into an automobile and carried for a long distance when he began to groan and show signs of life and Kuhlman then shot him three times and it was the shooting that killed him and therefore the charge that he did it with a blunt instrument is a variance and he should be acquitted. However, the law also says that one who inflicts an injury on another is deemed by the law to be guilty of homicide if the injury contributes mediately or immediately to the death of such other. The fact that other causes contribute to the death does not relieve the actor of responsibility. *Stephenson* v. *State* (1933), 205 Ind. 141, 186 N. E. 293; Wharton on Homicide (3 Ed.) p. 37; 67 L. R. A. p. 429; *Com.* v. *Costley* (1875), 118 Mass. 1; *People* v. *Lewis* (1899), 124 Calif. 551, 57 P. 470, 45 L. R. A. 783.

There is evidence in the record by a medical expert that the wounds received by Miller were sufficient to cause death and were fatal in character. The jury heard the evidence of the witness; they observed the photograph of the decapitated head of Miller and they had the right to infer from all they heard and saw that it was the blunt instrument that caused the death of Miller or at least that the injuries received from the said instrument

contributed mediately or immediately to his death. It may be that the moaning of Miller, which appellant insists showed life, was the last agonies of death that he was then in extremis.

The motion of appellant for a directed verdict of acquittal at the close of all the evidence was properly overruled.

There was no error committed in permitting Dr. Henry R. Alburger to answer the hypothetical questions put to him. He qualified as an expert to testify as to the effect of injuries sustained by Miller and the jury had the right to decide whether the evidence tended to prove the facts contained in the question. The hypothetical question put to the witness recited facts assumed to have been established by the evidence and which we think were fairly proven.

It is further insisted by appellant that there were irregularities in the trial that prevented him from having a fair trial in this: Kuhlman testified that when he was brought to Brookville he was placed in jail and in the same cell as Poholsky and Green who had already testified for the State and that he talked with them before he testified. The appellant has not set out any order of the court instructing Kuhlman not to talk to witnesses who had testified but even so there is no showing that there was any prejudice done to the appellant. And the failure of a witness to obey such rule may be shown to the jury as affecting his credibility but there is no reversible error unless harm is shown to be done the appellant.

The appellant complains of instruction 37, 38, 39, and 40. He asserts that these instructions told the jury that defendant would be guilty of homicide if the jury found that a conspiracy was formed between him, Kuhlman, Williams, and Poholsky to kill Harry R. Miller and if an assault and battery was committed upon Miller by a

blunt instrument which mediately or immediately caused his death notwithstanding that the proof of death was caused by shooting by some one else and notwithstanding the material allegations of the indictment were that death was caused by a blunt instrument.

We have given these instructions our most careful consideration and we think the appellant has given them a wrong interpretation. We think there can be no doubt but that instruction No. 37 is correct and likewise No. 38 which merely amplifies instruction No. 37. The material part of instruction No. 37 states: "One who inflicts an injury upon another is deemed by the law to be guilty of homicide, if the injury contributes mediately or immediately to the death of such other." We think this is a correct statement of the law and so declared in text books and decided cases. It is generally stated that if a wound is feloniously inflicted in such a manner as to put life in jeopardy, and death ensues as a consequence of that act, the fact that another injury was afterwards inflicted by another person does not palliate or excuse the first felonious act. The test as to the guilt of the persons inflicting the first wound in such case is whether, when death occurred, the first wound contributed to the event. If it did, although other independent causes also contributed, the casual relation between the unlawful acts of the accused and the death is made out. If the life current went out from both wounds, so that at the very instant of death the first wound was contributing to the event, the one who inflicted it is criminally responsible.

Wharton on Homicide (3 Ed.) p. 33. *Walker* v. *State* (1902), 116 Ga. 537, 42 S. E. 758, 787, 67 L. R. A. 426 n 2 p. 429, 13 R. C. L. p. 748; *People* v. *Lewis, supra.*

Instruction No. 39 may be divided into three parts and as we construe the instruction the court was merely call-

ing the attention of the jury to the proper venue of the case. In the first part the jury is told that if Hicks, acting in conjunction with Kuhlman, Williams, and Poholsky, did on the 11th day of June, 1936, commit an assault and battery, at and in the county of Franklin, Indiana, upon the person of Harry R. Miller, as set forth in one of the counts of the indictment, sufficient to cause death, then the prosecution was properly brought in Franklin county, Indiana; Second: the jury was told that if the said assault and battery was not sufficient to cause death then the prosecution was not properly brought in Franklin county; Third: the jury was further told that if it was satisfied if following said acts (assault and battery) in Franklin county, Indiana, the said Williams, Kuhlman, Poholsky, and Hicks, pursuant to a common design and purpose, committed further acts by shooting and jostling the said Miller, in Switzerland county or some other county in Indiana sufficient to cause death, when taken in conjunction with the acts committed in Franklin county, the venue would properly be in Franklin county, Indiana. With this interpretation, and we can see no other reasonable one, the instruction is not erroneous. And instruction No. 40 clearly shows to our mind that our interpretation of instruction No. 39 is correct.

It is first stated by the court in instruction No. 40, "To state the principles of law just enunciated, in other language, you will be called upon, gentlemen of the jury, to give consideration, among other things, to the two following propositions." The court then told the jury, First:

"Whether or not the State of Indiana has established beyond a reasonable doubt from all of the evidence introduced herein, that the defendant herein, Heber L. Hicks, acting in conjunction with William Kuhlman, Frank Williams, and John Poholsky, pursuant to a common design and for a common pur-

pose, and within the reasonable scope thereof, did, on or about the 11th day of June, 1936, at and in the County of Franklin, in the State of Indiana, commit an assault and battery upon, at and against the body of Harry R. Miller, as set forth in at least some one of the various counts of the indictment herein, sufficient to cause, directly or indirectly, within one year and one day thereafter, through a chain of natural causes, unchanged by human action, the death of the said Harry R. Miller.

Second. "Whether or not the State of Indiana has established beyond a reasonable doubt from all of the evidence introduced herein, that the defendant herein, Heber L. Hicks, acting in conjunction with William Kuhlman, Frank Williams, and John Poholsky, pursuant to a common design and for a common purpose, and within the reasonable scope thereof, did, on or about the 11th day of June, 1936, at and in the County of Franklin, in the State of Indiana, commit an assault and battery upon, at and against the body of Harry R. Miller, as set forth in at least some one of the various counts of. the indictment herein, and that following such acts in Franklin County, Indiana, the said William Kuhlman, Frank Williams, and John Poholsky, pursuant to a common design and for a common purpose, and within the reasonable scope thereof, all arranged in Franklin County, Indiana, jointly among themselves and the said Heber L. Hicks, committed further acts by way of shooting or justling in an automobile or otherwise, in Switzerland County, Indiana, or in some other county or counties in Indiana, and that the acts so committed in Franklin County, Indiana, or elsewhere in Indiana, both combined, were sufficient to cause, directly or indirectly, within one year and one day thereafter, through a chain of natural causes, unchanged by human action the death of said Harry R. Miller.

"If you, and each of you, should find that the State of Indiana has established the affirmative of either of such two propositions beyond a reasonable doubt, then I charge you that the prosecution of the defendant herein, Heber L. Hicks, under the indictment herein is properly brought in the Franklin Circuit Court of Indiana, and it is competent for you, gentlemen of the jury, to determine the guilt or the innocence of such defendant.

"If you, and each of you, should fail to find that the State of Indiana has established the affirmative of either of such two propositions beyond a reasonable doubt, then I charge you that you should find the defendant herein, Heber L. Hicks, not guilty."

So it clearly appears that in instructions 39 and 40 the court was merely calling the attention of the jury to the venue of the case. We find no error in the giving of said instructions.

One of the reasons assigned for a new trial is the discovery of new evidence material for the appellant and which he could not with reasonable diligence have discovered and produced at the trial.

The first affidavit is by the appellant Hicks wherein he states one Burnham Thomas told him that Kuhlman told Thomas that the attack upon Miller was not made at his home but that he was murdered in Kentucky; that Kuhlman told Hicks, while in jail and after the trial was over, that the crime was not committed in Indiana but in Kentucky and that the testimony he gave in the trial of Hicks that he (Hicks) was the instigator of the plot was false; that Flora Miller was the instigator; that Henry Green heard the conversation between Kuhlman and the affiant. Green was in jail at this time. He was a cousin of Kuhlman.

Burnham Thomas made an affidavit to the effect that Kuhlman told him that the crime was committed in Kentucky. Thomas had just received a life sentence for murder and was waiting in jail to be taken to Michigan City.

An affidavit was made by one Ruth Divine who stated that on the night of June 11th, 1936, she saw four men in a restaurant in Covington, Kentucky, and heard the men address one as "Harry" and "Cap"; that she later recognized pictures of Miller, Kuhlman, Williams, and Poholsky in a paper as being the same men she has seen in the restaurant.

The affidavits of Emma O'Dowd, Oakla Bay Bene, and

William Bene merely stated that they had seen Hicks and Miss Miller together in a restaurant or drug store.

Stephen L. Blakely, one of the attorneys for Hicks, made an affidavit to the effect that on December 26, 1936, Poholsky informed the court he wanted to talk to the affiant; that affiant insisted that Mr. Hopkins, attorney for Kuhlman, be present; that Kuhlman and Poholsky stated they had testified falsely against Hicks; that nothing happened at New Trenton; that on the night of the murder Miller met them at Miss Miller's home and that they took Miller across to Covington and then down near English, Kentucky, where they shot him; that affiant and Hopkins told them to give consideration before making any statements; that they had no further communications with them until late in January when Kuhlman said they thought chances were better if he agreed with the State's theory and Poholsky said he would do what ever Kuhlman did.

Carolyn Broerman, sister of Kuhlman states in an affidavit that he told her he wanted to retract his testimony in the Hicks case; that he had nothing to do with the Miller murder.

William Kuhlman made an affidavit to the effect that Miller was killed near English, Kentucky, and that Hicks had nothing to do with the murder. Poholsky made a similiar affidavit.

The foregoing were the only affidavits filed by the appellant. The State filed counter affidavits against the motion for a new trial.

The first, as appears in the record, is by Russell Coons, police officer, who stated that William Kuhlman had no opportunity to talk to Burnham Thomas.

The affidavit of William Kuhlman, dated February 16th, 1937, and before his trial, states that the evidence he gave in the Hicks trial was true and that he at no time repudiated it. Poholsky's affidavit, signed February 22,

1937, and before his trial was finished,. states he told the truth in the Hick's trial and that he at no time stated the crime was committed in Kentucky. The transcript of the evidence of Kuhlman in his trial, which began February 15, 1937, and the transcript of the evidence of Poholsky in his trial, which began February 22, 1937, were filed by the State. Kuhlman and Poholsky pleaded guilty and the evidence they gave corresponds to the evidence set out in the first part of this opinion and it is not necessary to repeat it here.

The court was called upon to consider all of the foregoing affidavits in determining whether or not a new trial should be granted on the grounds of newly discovered evidence. It is to be noted that the affidavits of Broerman, Poholsky, and Kuhlman filed by the appellant were not made and filed until after the court had ruled upon appellant's motion for a new trial. We are waiving, however, any objection made to them not being properly a part of the record on account of the nature and importance of this case.

It is a significant fact that there is no affidavit filed by Frank Williams, one of the conspirators, in behalf of the appellant. He did, however, swear to an affidavit that he had read appellant's motion for a new trial and that the affidavit of Ruth Divine was untrue and that he was never in Covington, Kentucky, with Miller on June 11th or any other time. And it is also significant that Green made no affidavit in view of the fact that Hicks in his affidavit stated Green was present and heard the conversation between Hicks and Kuhlman in which conversation Hicks stated in his affidavit that Kuhlman told him that the evidence he (Kuhlman) gave was false.

When the motion for a new trial was presented to the trial court on the grounds of newly discovered evidence

it became its duty to consider the affidavits presented by the appellant and the counter affidavits presented by the State. In conjunction with these affidavits it had the right, and evidently did, consider all the other evidence in the case in determining whether a new trial should be granted on this ground. The trial court after hearing all the evidence, observing the witnesses while testifying, determined that the newly discovered evidence was not sufficient to grant a new trial. The granting of such a motion rests in the sound discretion of the trial court and this court will not disturb such a finding unless there is shown a clear abuse of discretion. 16 C. J. 1183.

As said in the case of *Anderson* v. *State* (1928), 200 Ind. 143, 148, 161 N. E. 625,

"Motions for a new trial on the grounds of newly discovered evidence are received with great caution, and careful scrutiny is given to the evidence alleged to have been discovered. . . . The newly discovered evidence, in order to warrant the granting of a new trial, must be very material and decisive in character and be such as to raise a strong presumption that it, in all probability, will bring about an opposite result on another trial."

Cases cited. In the case of *Rector* v. *State* (1937), 211 Ind. 483, 487, 488, 7 N. E. (2d) 794, this court said: "This court has frequently had before it the question of the abuse of discretion of the trial court in refusing to grant a new trial on the ground of newly discovered evidence. The substance of the statements of this court upon that question is that newly discovered evidence must be so convincing as to raise a 'violent presumption that a different result would be reached upon a second trial' before we will overrule the judgment of the trial court. *Cooper* v. *State* (1889), 120 Ind. 372, 22 N. E. 320. The trial court should, of course, grant a new trial if it appears to him that it is probable that the newly discovered evidence would pro-

duce a different result in case of a new trial. But before we can say that a trial court has abused its discretion in the matter it must appear to us that the trial court could not have reasonably concluded that it was not probable that the newly discovered evidence would have such an effect."

In view of all the evidence in the case, and giving full consideration to the affidavits filed, we can not say that the trial court abused its discretion in refusing a new trial.

Assignments of error Nos. 2, 3, 4, 5, and 6 all go to the same proposition, which is that the court erred in fixing the date of execution on April 10, 1937, which was less than one hundred days after the overruling of the motion for a new trial. Judgment was rendered on December 21, 1936, the same night the jury returned its verdict. The motion for a new trial was overruled on March 13, 1937. It appears from the records of this court that the appellant has been granted two stays of execution upon his own motion and execution has been stayed by this court until February 4, 1938. So it clearly appears that if there were any error committed by the trial court in fixing the date of execution it has been cured by the action of this court in extending the time to February 4, 1938.

The 44th reason for a new trial is that the verdict is contrary to law and the 45th reason is that it is not sustained by sufficient evidence.

We can not assent to either of these reasons. We have carefully read the evidence in this case, and are fully convinced that it is sufficient to sustain the verdict and that it is not contrary to law. We have considered all of the alleged errors of the appellant and are satisfied that the appellant had a fair trial and finding no reversible error the judgment is affirmed.

Judgment affirmed.

## On Petition for Writ of Error Coram Nobis

Hughes, J.—The appellant was tried and convicted for the murder of one Harry R. Miller and sentenced to be electrocuted. A motion for a new trial was overruled and he appealed from the judgment of conviction to this court which affirmed the judgment of the lower court on the 24th day of November, 1937. On the 22nd day of January, 1938, the appellant filed a petition for a rehearing in said cause which is now pending.

The appellant, before the petition for a rehearing has been passed upon, files a petition for permission of this court to file a petition for a writ of error *coram nobis* in the trial court, the Franklin Circuit Court, and for a further stay of execution.

It is alleged in the petition that in the motion for a new trial on the grounds of newly discovered evidence that the affidavits of Carolyn Broerman, William Kuhlman, and John Poholsky were filed after the court had ruled on the motion for a new trial; that said affidavits were not considered by the trial court, but that they were included as part of the record on appeal and considered by this court; that he now desires to file a petition for a writ of error *coram nobis* on the ground of newly discovered evidence and will file in support of said petition the affidavits of the above named parties.

Although the affidavits of the three parties named were not properly in the record on appeal, the court, as the opinion states, considered these affidavits and also counter affidavits filed by the State. Kuhlman and Poholsky are now dead, having been electrocuted for the murder of Miller. After they were sent to the Indiana State Prison they made statements indicating that their testimony given at the trial of Hicks, as to the part he took in the murder of Miller, was false. The affidavit of Carolyn Broerman, sister of William Kuhlman, contains state-

ments made by him which supports, in a general way, the affidavit made by Kuhlman.

> The writ of error *coram nobis* is in the nature of a motion for a new trial, and if granted, has the same effect. And as said in the case of *Stephenson* v. *State* (1913), 205 Ind. 141, 196, 179 N. E. 633,

> "In so far as applicable, the sufficiency of the petition will be tested by the rules applicable to motions for a new trial because of the newly discovered evidence."

A new trial will not be granted on newly discovered evidence which merely impeaches or contradicts evidence given at the trial. In the case of *Morel* v. *State* (1883), 89 Ind. 275, 279, it is said:

> "It is well settled by the decisions of this court, 'that a new trial will not be granted for the admission of newly-discovered evidence to contradict or impeach the testimony of a witness on a previous trial, either by showing that the reputation of such witness was bad for truth, *or that his testimony on the former trial was false'*." (our italics) *Evans* v. *State* (1879), 67 Ind. 68; *Shirel* v. *Baxter* (1880), 71 Ind. 352.

The only purpose of filing the affidavits in question would be for impeachment and to show that the testimony given by Kuhlman and Poholsky at the trial was false.

Under the authorities above cited this can not be done in a motion for a new trial, nor can it be done to sustain a petition for a writ of error *coram nobis*.

Petition of appellant denied.