**Rosetta WALLACE, Appellant
(Defendant Below),**

v.

**STATE of Indiana, Appellee
(Plaintiff Below).**

**No. 678S101.**

Supreme Court of Indiana.

Sept. 30, 1981.

Charles L. Berger, Evansville, for appellant.

Theodore L. Sendak, Atty. Gen., Robert J. Black, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted of Murder in the First Degree, Ind. Code § 35–13–4–1 (Burns 1975), and sentenced to life imprisonment. For the reasons stated below, we reverse and remand for a new trial.

The evidence viewed in the light most favorable to the State, discloses that the defendant conspired with Floyd Shelby to murder her husband, Ben Wallace. Shelby, in turn, hired one Marvin Johnson to perform the act for two thousand dollars ($2,000.), payment to be made when the defendant received the proceeds from an insurance policy upon her husband's life.

On March 17, 1975, Shelby and Johnson went to a house where Ben Wallace was working. Shelby struck Wallace with a crowbar, and gave Johnson a .25 caliber automatic with which to kill him. The gun jammed, however, when Johnson attempted to fire it, whereupon he returned it to Shelby, who cocked it and proceeded to shoot Wallace three times, which caused his death.

In the middle of deliberation, the jury foreman advised the trial court that the jurors wanted to know what "competency of witnesses" and "reasonable doubt" meant. Over the defendant's objection, the trial court gave an additional instruction, number 17, in writing:

> "All witnesses who have testified in this case are presumed to be competent. However, their credibility is a matter for the jury to determine based on all the evidence in light of the other instructions."

■ When the jury indicates that it has a problem in its deliberations concerning an issue of law, the trial court should reread the instructions without further comment. *Cameron v. State*, (1979) Ind., 383 N.E.2d 1039, 1041; *Brannum v. State*, (1977) 267 Ind. 51, 57, 366 N.E.2d 1180, 1184; *Woods v. State*, (1974) 159 Ind.App. 92, 97, 304 N.E.2d 817, 820. We held in *Brannum* that the giving of a special instruction on a particular issue tends to emphasize that issue as being of primary importance. It also tends to tell the jury what it ought to do with respect to that issue. A trial court may not give the jury directions through its instructions. *Sater v. State*, (1877) 56 Ind. 378, 382; *Albin v. State*, (1878) 63 Ind. 598. Further, Ind. Code § 35–1–35–1 (Burns 1975) provides that all instructions are to be reduced to writing by the court and indication given by him to all the parties prior to the commencement of argument, that these are the instructions to be given to the jury. The statute further provides that in no case shall any of the instructions be orally qualified, modified, or in any manner orally explained to the jury. The trial court should have responded to the foreman's request for clarification by rereading all the final instructions without further comment. The

defendant's objection to the giving of Instruction Number 17 should have been sustained. *See Lewis v. State*, (1981) Ind., 424 N.E.2d 107.

For purposes of the retrial, we address the following issues raised by the appeal:

(1) Whether the trial court erred in overruling the defendant's motion to exclude the testimony of Leola Copeland.

(2) Whether the trial court erred in its ruling with respect to the defendant's motion concerning the alibi notice statute.

(3) Whether the trial court erred in admitting the testimony of Marvin Johnson.

(4) Whether the trial court erred in granting the State's petition to compel the testimony of Marvin Johnson.

(5) Whether the trial court erred in admitting evidence of a conspiracy.

\* \* \* \* \* \*

## ISSUE I

█ The defendant moved to exclude the testimony of her sister, Leola Copeland, upon grounds of her insanity, Ind.Code 34–1–14–5 (Burns 1973). An evidentiary hearing was had thereon, outside the presence of the jury, and the motion was overruled. Over objection, Leola related a conversation that she had had with the defendant. Leola, at the time of the conversation, was living in the Wallace household. In the middle of the night, Ben had been shot in the leg, while he slept. Several days later the defendant told Leola that, "They didn't get him there but they will get him 'cause they are going right over there where he works at. They'll get him there." The witness also related that the defendant had further stated at that time that if she did not kill Ben, Ben was going to kill her, and that about a month after Ben's death, the defendant told Leola that she had paid Shelby four thousand dollars ($4,000.) for killing Ben.

At the time of trial Leola was a patient at the Evansville State Hospital. She suffered from paranoid Schizophrenia, a chronic mental illness characterized by delusions and odd or nonconforming behavior. At the hearing to determine the competency of Leola to testify, various experts who had examined Leola testified. An expert witness, Dr. Mittelman, related her history of mental illness and that while she was hospitalized she was given medication, psychotropic drugs, to control the intensity of her delusions. The delusions had been directed at the defendant, whom Leola believed was responsible for her commitments to the State Hospital and whom Leola believed intended to kill her. Leola was under such treatment at the times of the above mentioned conversations.

Dr. Mittelman further testified that Leola had a good memory of the events that had occurred in 1975 and 1976, but had stated that her birthdate was June 7, 1929, when it was actually June 30, 1914. She had also expressed some concern and reluctance about testifying against her sister. During his examination of her, Leola related her sister's aforementioned disclosures in a casual fashion. He expressed the opinion that Leola's memory of her sister's disclosures had not been affected by the delusions, however, he admitted having some reservations concerning such opinion.

> "A. I am saying this because I feel that ordinarily speaking if I have some paranoid ideas about somebody else and I would have to reproduce a conversation that I had that would incriminate this particular person I would expect that my delusions would color this and I might color my statement and yet as I said before my own personal impression and professional impression is that whatever she said was fairly accurate and reliable. This might not help you."

Dr. Peduck testified about Leola's contact with reality on December 5, 1977, the day before the competency hearing. On cross-examination Dr. Peduck stated:

> "XQ In your conversation do you have an opinion as to know whether she would understand it is to tell the truth and to lie?

"A That is too special a question but I think if she has been repeating repeatedly what she has said I am sure that she knows what she is talking about.

"XQ From your interview with her yesterday do you think she has the ability to understand what the obligations to tell the truth would be?

"A In her state of mind yesterday I think so."

Dr. Denzer, added nothing to defendant's claim. On cross-examination he related Leola's condition when he examined her the day before. Her recollection of the past had been good. He believed that she understood what it meant to tell the truth.

The defendant's next witness, Dr. Allen, had performed an evaluation of Leola upon her initial admission to the Evansville State Hospital in February, 1974.

"Q Would you have any opinion as to Leola Copeland's ability at that time to be able to perceive events around her?

"A Well, obviously, she did perceive events around her but whether she fully understand them or not.

"Q I believe you testified she had problems with memory.

"A Yes, at the time I saw her I thought she had gross memory deficits and was unable to recall past events."

On cross-examination Dr. Allen testified that he could not tell what Leola's ability to recollect events had been at the time of her conversations with the defendant or thereafter.

Dr. McCoy, testified about Leola's condition at the time she had been at the Welborn Memorial Baptist Hospital for seventeen (17) days in September, 1976. He offered no opinion about Leola's condition in March, 1975, the time of Ben's murder, and no opinion about Leola's condition at the time of the hearing.

The State called Thursel Lundy, who lived in the defendant's house at the time that Leola was there in 1975. He testified that Leola's behavior was then normal.

The defendant then called her seventeen (17) year old daughter, Aleschia Wallace, who testified that when Leola lived in the defendant's house, she frequently spoke of demons and evil spirits and that she walked around in a daze.

Finally, the State called Leola Copeland. She related her life story and then testified as follows:

"Q Do you believe in God?

"A I believe in God.

"Q Do you know what it means to tell the truth?

"A I certainly do.

"Q Do you know what an oath is?

"A Yes.

"Q What is an oath?

"A An oath is when you, you are under oath when you come into Court Room. They put you under oath.

"Q Do you know what happens if you don't tell the truth when you are under oath?

"A Yes.

"Q Can you explain what happens?

"A Send you to prison.

"Q Do you have any feelings about coming here and testifying today?

"A Yes.

"Q Is it difficult in any way for you to do this?

"A I don't know if it is difficult but I just hated to have to come to do it.

"Q Can you explain why, please?

"A Because she is my sister and I hate for anything to happen to her.

"Q Nonetheless, you promise to tell the truth to us?

"A Yes."

On cross-examination Leola discussed her conversation with God, the last one being in 1972, and that the devil talks to everyone everyday.

On recross-examination she admitted that a long time ago she had seen a demon dressed like a mummy.

"It is the general rule that unsoundness of mind does not per se render a witness incompetent. The test of competency of a witness is whether the witness has sufficient mental capacity to perceive, to remember and to narrate the incident he has observed and to understand and appreciate the nature and obligation of an oath. (Citations omitted).

"When the trial court has passed upon the issue of competency of a witness and has found the witness to be competent, the reviewing court will interfere only if a manifest abuse of discretion appears." (Citations omitted). *Ware v. State,* (1978) 268 Ind. 563, 565, 376 N.E.2d 1150, 1151–52.

The defendant emphatically urges us to hold that the trial court's finding Leola Copeland competent was a manifest abuse of discretion. We have examined the testimony and evidence adduced on the issue and find, as related above, that there was sufficient evidence on each of the required elements of competency as stated in *Ware.* The expert testimony indicated that Leola Copeland might tell the truth or might testify on the basis of a delusion. It was not conclusive. There was no manifest abuse of discretion in the trial court's ruling. *Brown v. State,* (1980) Ind.App., 403 N.E.2d 901, 913.

### ISSUE II

Pursuant to Ind.Code § 35–5–1–1 (Burns 1975) the defendant filed a timely notice of alibi, which requested the prosecutor " * * * to file and to serve upon the defendant or upon his counsel a specific statement in regard to the exact date which the prosecution proposed to present at the trial as the date when, and the exact place which the prosecution proposed to present at the trial as the place where the defendant was alleged to have committed or to have participated in the offense." Ind.Code § 35–5–1–2 (Burns 1975). The State's response, which was filed two days late, informed the defendant that the theory of the case was a conspiracy, which began in November, 1974 and continued for an unknown number of months after March 17, 1975, and that the State had no evidence, which placed the defendant at the scene of Ben Wallace's murder. The defendant responded with a motion in limine to confine the State to March 17, 1975, the date alleged in the information, and a motion for a continuance. Both motions were denied, and the trial court ordered the State to file an affidavit of good cause for the late filing. The State filed the affidavit, and the defendant responded with a motion in opposition thereto, alleging that good cause was not shown. The defendant also filed a motion to make the State's answer more specific with respect to the date and place of the conspiracy, which the trial court granted, and to which the State responded by leave of court with an Information for Count II, Conspiracy to Commit a Felony, to-wit: Murder. The trial court severed Count II from Count I.

The defendant filed yet another motion in limine and a motion to dismiss. The motion in limine alleged that the State had failed to comply with the trial court's order to make its answer to the defendant's alibi notice more specific and sought again to confine the State's case to March 17, 1975. Both motions were denied. The State then filed a supplemental answer to the defendant's alibi notice, which stated more details of the conspiracy, including that its purpose was to collect life insurance benefits upon Ben Wallace's death. The dates of the conspiracy were stated as commencing in November or December, 1974 and continuing past March 17, 1975 to include the dates of application for and receipt of the insurance money. The defendant responded with a second motion to make the State's answer more specific, asking the court to require the State to allege the date and the place of the conspiracy. The State filed a reply, which stated the remainder of the State's case, that Johnson and Shelby shot Ben Wallace, and the trial court denied the defendant's motion.

The defendant first contends that the trial court should have granted her motion for a continuance.

When the prosecutor serves his answer to the defendant's alibi less than eight (8) days before trial, Ind.Code § 35–5–1–2 (Burns 1975), the defendant's remedy is a motion for a continuance and a showing of how the defendant is prejudiced by the scheduled trial date. *Reed v. State*, (1963) 243 Ind. 544, 551, 188 N.E.2d 533, 536. The defendant's motion for a continuance, while timely, sought a delay of her trial until the outcome of the trial of Floyd Shelby could be determined. The motion made no charge of any prejudice resulting from the State's late filing of its answer to the alibi notice.

Defendant has cited *Dew v. State*, (1981) Ind., 416 N.E.2d 1245 as additional supplemental authority upon this issue, but in that case the trial court had permitted the introduction of evidence in conflict with the appellant's alibi notice notwithstanding that there had been no specific statement filed by the State in response to the appellant's notice.

The defendant next contends that her motion for a continuance falls within the rule stated in *Woods v. State*, (1968) 250 Ind. 132, 143, 235 N.E.2d 479, 485:

"Where there is a substantial variation between the time of the crime charged in the indictment or affidavit, and the time of the crime as shown by the State's evidence, and defendant is relying upon an alibi, it appears that upon timely motion by defendant a continuance should be granted."

The aforementioned motion for a continuance did not address the problem of which the defendant now complains. The record shows that the defendant made no motion for a continuance upon the grounds of variances with respect to the time the crime was committed. The issues that she seeks to raise have been waived. *Reed v. State*, *supra*.

The defendant lastly contends that the State's answer merely relating that the conspiracy charged began in November or December, 1974 and terminated some time after March 17, 1975, when the insurance proceeds were received and distributed was not sufficiently specific and consequently, that the trial court erred in not confining the State to proof of the events of March 17, 1975 and in denying the motion to dismiss.

In *Bruce v. State*, (1978) 268 Ind. 180, 207, 375 N.E.2d 1042, 1058, *cert. denied*, (1978) 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662 we stated:

"We believe that the purpose of the notice of alibi statute is to narrow the factual issues of time and place to the degree practicable. Consequently we hold that section 35–5–1–2 requires the prosecutor to state the time of the offense with such reasonable specificity as the circumstances of the case allow. Hereafter, if the evidence available to the State permits, the prosecutor's statement must specify the time of day as well as the date; conversely if the evidence does not permit exact determination of the time of the offense more exactly than a period of several days, the State is required only to respond that the offense occurred within such a period."

The basis for the defendant's liability is the procuring of the murder of Ben Wallace. Ind.Code § 35–1–29–1 (Burns 1975). We allow the State to charge a defendant as a principal and then to prove that he was an accessory. *Lawson v. State*, (1980) Ind., 412 N.E.2d 759, 763. The evidence allowed the jury to find that the defendant initiated a plot in which she hired a third party to kill her husband and paid him for his services with life insurance proceeds. The events of the plot did not occur on one day or date. In *Bruce* we contemplated that there might be a case which would call for flexibility in applying the sanctions of the alibi notice statute to a claim of lack of specificity in the State's answer. The defendant's criminal liability for the offense charged, Murder in the First Degree, did not accrue until Floyd Shelby killed Ben Wallace. With respect to the *act*, which gave rise to liability, the State's answer informed the defendant of the date and place of Ben Wallace's death. That answer was filed late, however, the trial

court found that the State showed good cause for the two day delay, and the defendant, while vigorously asserting a want of good cause shown, has not shown us how she was harmed by the delay. *Miller v. State*, (1980) Ind., 405 N.E.2d 909, 912; *Hester v. State*, (1974) 262 Ind. 284, 291, 315 N.E.2d 351, 355. We find no error in the trial court's rulings.

## ISSUE III

Defendant next assigns three errors with respect to the admission of the testimony of Marvin Johnson. Johnson provided an eye witness account of Ben Wallace's murder, in which Floyd Shelby killed Wallace. He linked the defendant to the crime by relating several statements made by Shelby, which were hearsay. Shelby did not testify.

"Reference should here by made to the well established rule in this state that evidence of acts or statements of parties to a conspiracy in furtherance of its objects, is admissible against all the parties to the conspiracy though the statements were made or the acts were performed in the absence of the defendants. (Citations omitted).

"However, it is also true that before the acts or declarations of one conspirator are admissible into evidence against a co-conspirator, there must be some evidence, either direct or circumstantial of the existence of a conspiracy." *Patton v. State*, (1961) 241 Ind. 645, 648, 175 N.E.2d 11, 12.

The defendant contends that there was no foundation laid showing the existence of a conspiracy prior to the admission of the hearsay testimony.

■ The existence of the conspiracy may be shown by direct or circumstantial evidence, and the evidence need not be strong. *Dye v. State*, (1891) 130 Ind. 87, 89, 29 N.E. 771, 772.

"Much latitude must, however, be allowed by the court in marshalling the facts and circumstances which bear upon the issue, and it must be left very largely to the discretion of the court trying the cause to determine whether or not there has been introduced evidence sufficient to establish prima facie the existence of a conspiracy so as to justify the admission of the acts and declarations of one confederate against another. (Citations omitted). Such declarations are admissible after the confederacy has been thus established, upon the theory that the conspirators have, by the act of conspiring together, become so identified with each other in a common design as to assume as a body or association the attributes of individuality, thus rendering whatever is done or said by any one during the progress of the joint enterprise, in furtherance of the common purpose, admissible as the act or declaration of all." *Moore v. Shields*, (1889) 121 Ind. 267, 269–70, 23 N.E. 89, 90.

Johnson's testimony disclosed that, at the very least, there was a conspiracy between Floyd Shelby and himself, to murder Ben Wallace. This testimony was not hearsay. *Gubitz v. State*, (1977) 172 Ind.App. 343, 347, 360 N.E.2d 259.

■ The defendant's involvement in the plot was suggested by the admissions that she had made to Leola Copeland and by the testimony of one, Thursel Lundy.

In the early part of 1974, the defendant first approached Lundy about "taking care" of Ben. In October, 1974, the defendant paid Lundy two thousand three hundred dollars ($2,300.). Prior to such payment, it appears, Lundy and the defendant met in San Francisco, where Lundy told the defendant that he could not go through with it. She replied, "I didn't think you could from the beginning." After October, 1974, Lundy received more money from the defendant, by telegraph, while he travelled in Florida and Georgia. When Lundy returned to Evansville, the defendant met him at a motel and gave him seven hundred fifty dollars ($750.) and a .38 caliber pistol. The pistol was to be used to shoot Ben that night, and the money was for Lundy's escape. Lundy abandoned the plot and headed for Atlanta.

After Ben's death, Lundy spoke with the defendant by telephone, and she told him that Ben had died of a heart attack.

The defendant became acquainted with Lundy in January, 1974, when he came to live in the Wallace household at Ben Wallace's invitation. Lundy was to teach Wallace how to repair electrical appliances. The circumstances occurring thereafter give rise to an inference that Lundy and the defendant were having an extra-marital affair. Ruby Dawson, Defendant's daughter-in-law, testified about picking up the defendant, at a motel in Henderson, Kentucky in December, 1974. Floyd Shelby, Ruby's brother, had accompanied her. Lundy testified that he and the defendant had driven from Florida to Evansville in December, 1974, and that they had stayed in a motel in Henderson. The defendant did not want Lundy to return to Evansville with her because she did not want her husband to see him.

The above related evidence, taken as a whole, would allow a trier of fact to infer that the defendant had been engaged in an ongoing enterprise to procure an agent for the purpose of murdering her husband. It is an adequate circumstantial foundation to evidence the existence of a conspiracy.

■ The defendant next contends that she could not cross examine Floyd Shelby, the hearsay declarant, whose statements were related by Marvin Johnson, and that the jury did not have an opportunity to observe Shelby's demeanor and to determine his credibility. We acknowledge that Marvin Johnson's testimony concerning what Shelby told him was hearsay. However, that the testimony was hearsay is not, in this case, determinative of its admissibility. The defendant attempts to bolster her argument with an admission made by the State in open court that the State had a statement from Floyd Shelby, which contradicted Marvin Johnson's version of the murder, and that the State believed that Shelby was a liar. It is further argued that Johnson, because of his need to bargain and because he had been provided immunity, had every reason to fabricate testimony.

We can understand why Shelby and Johnson might disagree about Ben Wallace's murder; however, Johnson's possible motives for testifying were presented to the jury, and we will not redetermine the credibility of a witness unless his testimony is inherently unbelievable. *Bentley v. State*, (1981) Ind., 414 N.E.2d 573, 574. There is no merit to the defendant's argument.

■ Lastly, in this regard, the defendant contends that Johnson was allowed to testify concerning statements made after the completion of the conspiracy.

"It is further well established that only those acts and declarations which transpired or were made between the beginning and the ending of the conspiracy and in furtherance of its objects may be shown against the asserted coconspirators who did not make the declarations or do the acts in question." *Patton v. State*, (1961) 241 Ind. 645, 648, 175 N.E.2d 11, 12. Accord, *Berry v. State*, (1929) 202 Ind. 294, 302–03, 165 N.E. 61, 64 (cases cited therein).

The defendant contends that the conspiracy ended with the death of Ben Wallace. There is language in several of our cases which would support this reasoning. *Marjason v. State*, (1947) 225 Ind. 652, 654, 75 N.E.2d 904, 905 (statements made after commission of the crime are inadmissible, citing *Dye v. State, supra*); *Kahn v. State*, (1914) 182 Ind. 1, 5, 105 N.E. 385, 387 (statements of coconspirators not admissible when made after the underlying offense is committed); *Walls v. State*, (1890) 125 Ind. 400, 402–03, 25 N.E. 457, 458 (declarations made after the common enterprise is at an end, whether by accomplishment or abandonment, are inadmissible).

In *Hicks v. State*, (1937) 213 Ind. 277, 287–88, 11 N.E.2d 171, 176, *cert. denied*, (1938) 304 U.S. 564, 58 S.Ct. 951, 82 L.Ed. 1531, we stated:

"The third error complained of by the appellant is that the court erred in permitting John Poholsky to answer the following question over appellant's objection: —'Did Kuhlman do anything at all before you cut the head and hands off?'

for the reason that said statement was the statement of an alleged co-conspirator made after the consummation of the alleged conspiracy. The conspiracy in the instant case was not only to murder Harry R. Miller, but it was also to mutilate and dispose of the body after the murder. Therefore the declarations and acts of a conspirator during the existence of the conspiracy and until it is completed are admissible against the co-conspirators. (Citations omitted). There can be no question under the evidence in the instant case that part of the conspiracy was to mutilate and dispose of the body. This was just as much a part of the conspiracy as was the murder and the disposal of the body was in furtherance of the conspiracy."

From our holding in *Hicks*, we discern that for purposes of admitting a coconspirator's declaration, the conspiracy and its objectives will not always be terminated upon the successful commission of the underlying offense. *See Card v. State* (1886) 109 Ind. 415, 419, 9 N.E. 591, 593. The evidence in this case shows that the agreement or conspiracy contemplated that the defendant would pay Shelby from insurance proceeds and that he, in turn, would pay Marvin Johnson. Two checks, in a total amount of three thousand two hundred one dollars and sixty-two cents ($3,201.62) issued to Rosetta Wallace by the Herald Life Insurance Company on April 17, 1975 were admitted into evidence.

Johnson testified that Shelby had said that they would split two thousand dollars ($2,000.) for killing Ben. Shelby paid Johnson one hundred forty dollars ($140.), in three (3) installments, prior to the shooting and eighty dollars ($80.) from Ben's wallet after the shooting. About a week after the shooting, Shelby told Johnson that the fee was to be but one thousand dollars ($1,000.). A week later Shelby paid Johnson three hundred dollars ($300.) and stated that the money had come from the defendant. Sometime thereafter, Johnson complained about the reduced fee. Shelby responded that he would talk to the defendant, and later told him that there would be no more money. Each of these conversations was in furtherance of the conspiracy's designs and objectives, murder for hire. There was no error in allowing Johnson to testify concerning them.

### ISSUE IV

 In August, 1977 the State and Marvin Johnson entered into a plea agreement. In exchange for Johnson's testimony in four unrelated cases, including the one at bar, the State agreed to accept his plea to charges of Sodomy and Rape and to make certain sentencing recommendations. It appears that prior to the trial of this cause in December, 1977, Johnson indicated that he would not carry out his part of the bargain. A hearing was had on the State's Motion to Compel his testimony, and he there testified that, on advice of counsel, he would assert his privilege against self incrimination in response to any questions about the Wallace murder. After hearing the evidence, the trial court granted the State's motion pursuant to Ind.Code § 35-6-3-1 (Burns 1975):

"Any witness, in any criminal proceeding, before a court or grand jury, who refuses to answer any question and/or produce any evidence of any kind on the ground that he may be incriminated thereby, may be ordered by the court to answer any question and/or produce any evidence upon a written request by the prosecuting attorney" Provided, That the witness shall be provided with timely notice and a separate hearing on the merits of the order. *Unless the court finds that the issuance of the order would be clearly contrary to the public interest*, the witness shall comply with the order of the court. * * *."

The defendant contends that it was clearly not in the public interest to grant the State's request to compel Johnson's testimony. The defendant bases her argument on Johnson's admission that he tried to kill Ben Wallace, i. e., the seriousness of the offense, and that the State did not need Johnson's testimony to survive a directed

verdict. In effect the defendant asks us to hold that it was clearly contrary to the public interest to compel the testimony of a coconspirator, where that testimony was not necessary to permit the case to go to the jury.

Ind.Code § 35–6–3–1 exists for the benefit of the State. *Walters v. State* (1979) Ind., 394 N.E.2d 154, 157. If we were to adopt the defendant's concept of what is clearly contrary to the public interest, we would remove the very benefit which Ind. Code § 35–6–3–1 confers. The purpose of the statute is to assist the prosecutor in the successful investigation and prosecution of crime. In a prosecution for murder, it is not unusual for the only witnesses of the homicide to be the participants therein. While it is true, as the defendant asserts, that Leola Copeland's testimony is highly implicative of the defendant's involvement in the crime, Johnson's testimony provides the res gestae of the offense, the murder of Ben Wallace. As we stated above, this event, the killing of Ben Wallace, gave rise to the defendant's liability for murder. We are not convinced that it was clearly contrary to the public interest for the jury to hear Johnson's account of the plot and homicide and thereafter to determine his credibility.

■ The defendant also contends that it was error for the trial court to deny her Petition to Set Aside the Verdict and Sentence because of Newly Discovered Evidence. The new evidence consists of comments made by the prosecutor to the jury in the trial of John Samuels for the murder of Joseph Milinet, in which Johnson testified. The prosecutor told the jury:

"I would suggest to you that we don't need Marvin Johnson really in this case. This is not the case he got his deal for."

At the hearing on the motion to compel Johnson's testimony, the prosecutor argued that Johnson's testimony was vital to both murder trials. The defendant asserts that, it having been established that Johnson's testimony was not vital in either trial, it was clearly contrary to the public interest to compel the testimony. We fear that the

defendant would have us interpret Ind.Code § 35–6–3–1 as requiring the State to show that the compelled testimony is vital or necessary to sustain the verdict. The statute contemplates only that the trial court should issue the order to compel the testimony, unless it finds that the order would be clearly contrary to the public interest. There is no provision, nor can one be reasonably inferred, that the order should be denied unless the State's case is dependent upon the testimony which it seeks to compel. *Worthington v. State,* (1979) Ind.App., 391 N.E.2d 1164, 1167.

### ISSUE V

■ Three days before the trial, the court, over objections, granted the State leave to file Count II of the information, Conspiracy to Commit a Felony, to-wit: Murder. This Count was eventually dismissed. Although the court severed Count II, the defendant asserts that the allowance of evidence relating to the conspiracy vitiated the effect of the severance.

"Appellant, under the indictment herein, might have been convicted of committing the offense in question through a conspiracy with others, for it is settled that in the prosecution of a criminal case in which the real offense perpetrated is not a conspiracy, the State, may, without charging or referring to any conspiracy in the indictment, prove that the accused conspired or combined with others in the commission of the felonious crime charged against him." *Brunaugh v. State,* (1910) 173 Ind. 483, 507–08, 90 N.E. 1019, 1029.

It is the defendant's contention that *Brunaugh, supra,* and *Cook v. State,* (1907) 169 Ind. 430, 82 N.E. 1047, should not be followed because of the want of factual similarities. However, we do not find the doctrine above expressed peculiarly applicable to the circumstances of those cases.

The judgment of the trial court is reversed and the cause is remanded for a new trial.

DeBRULER, HUNTER and PIVARNIK, JJ., concur.

GIVAN, C. J., dissents with opinion.

GIVAN, Chief Justice, dissenting.

I respectfully dissent from the majority opinion in this case. I refer to my dissent in the case of *Mark Jenkins v. State*, (1981) Ind., 424 N.E.2d 1002, handed down by this Court August 18, 1981. The situation in the case at bar is similar to the situation in the *Jenkins* case. The jury foreman requested of the court further instructions as to the meaning of "competency of witnesses" and "reasonable doubt". In response to that inquiry, the trial judge, over the objection of the defendant, gave an additional instruction, number 17, which is quoted in the majority opinion.

In addition to the reasons I gave in *Jenkins* for my dissent which I believe are equally applicable to the case at bar, I would also point out that the trial court's instruction, number 17, given in response to the inquiry of the jury foreman was completely innocuous. There was no attempt on the part of the trial judge to add anything to his former instructions. There was no definition of the meaning of any terminology but a bare admonition to the jurors that all witnesses who testified are presumed to be competent and their credibility is a matter for the jury to determine. I am at a total loss to see how such a statement on the part of the trial judge during deliberation could prejudice the defendant.

I agree with the cases cited by the majority in support of their position and I firmly believe that we should adhere to a set of rules concerning the instructions of juries. However, I do not believe a set of otherwise good rules should be administered in a blind adherence to the letter of the rule in the absence of obvious jeopardy to the person charged with the crime. In my dissent in *Jenkins*, I opted for a reasonable response of a trial judge to a reasonable inquiry of a deliberating jury.

In the case at bar, had the judge attempted to answer the questions posed by the jury I would have taken the same position I took in *Jenkins*; however, the trial judge in this case did not go as far as the trial judge in *Jenkins*. The trial judge made no direct response to the questions. His so-called instruction, number 17, was really little more than a statement that the jury should rely on the initial instructions given. I concur with the majority opinion in the other questions resolved in view of the up-coming new trial.

I would, therefore, affirm the trial court.