**Charles CLARK, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 781S180.

Supreme Court of Indiana.

April 22, 1983.

Peter D. Shaw, Smith, Shaw & Wilhoite, Connersville, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted, after trial by Jury, of Attempted Rape, Ind. Code § 35–41–5–1; § 35–42–4–1 (Burns 1979), Battery, Ind.Code § 35–42–2–1(1) (Burns 1979), and Intimidation, Ind.Code § 35–45–2–1 (Burns 1979), and sentenced to a total of thirty (30) years imprisonment. This direct appeal presents the following issues:

(1) Whether the circumstantial evidence of the identity of the assailant was sufficient to sustain the convictions.

(2) Whether the trial court erred in admitting into evidence two items of men's underwear (a T-shirt and a pair of shorts) over Defendant's objection that there had been no evidence presented connecting the exhibits to him.

(3) Whether the trial court erred in permitting the prosecutrix to testify over Defendant's pre-trial motion to suppress and in-trial objection, both premised upon a claim of witness incompetence occasioned by her having been previously interrogated by the State while in a state of hypnosis.

The evidence and inferences permissibly drawn therefrom, when viewed most favorably to the verdict, revealed that in the early evening of October 11, 1979, the defendant was drinking beer and visiting with a friend in a Connersville tavern, when Terry Isaacs, a co-defendant, arrived in the company of his friend, Steve Potts. The group visited and drank beer for approximately an hour and left in the defendant's two-seated truck. They took Defendant's friend to his motel, where he remained, and the three then purchased some whisky and soft drinks.

The three continued with their drinking and decided to seek some female company.

Potts, a married man, volunteered to call upon the prosecutrix, his ex-girlfriend, and that perhaps she would have some friends. They proceeded to the home of the prosecutrix, Kathy, and she joined them at about 9:30 p.m. but produced no other girls.

They went to a tavern, and the defendant and Isaacs entered while Potts and Kathy remained in the truck, and Potts asked her if she would "go to bed" with the defendant and Isaacs, to which she answered, "No." Potts then entered the tavern to get the other two and returned in about fifteen minutes and said that they were playing a game of pool and wanted to finish.

Potts and Kathy then engaged in an act of sexual intercourse in the front seat of the truck and then entered the tavern. While the four were in the tavern, Isaacs asked Kathy if she would "go to bed" with him and she said, "No."

The party then returned to the truck and drove into the country. Isaacs and Defendant asked Kathy again to "go to bed" with them, and she refused. Clark was driving, and Isaacs told him to drive faster. Defendant then drove the truck in a reckless manner, at Isaacs' urging, and after further unsuccessful attempts to persuade Kathy to have sexual intercourse with them either the defendant or Isaacs told her to "Put out or get out." Kathy said that she would get out. The truck was stopped. Isaacs opened the door and Kathy walked away in the direction opposite to the direction they had been traveling.

Defendant turned the truck around, and the three followed and passed Kathy. They stopped a short distance beyond her and parked in a cornfield. Defendant and Isaacs got out of the truck, ostensibly to urinate, and disappeared. Potts got out of the truck, waited briefly and then started walking towards town. After he had walked a short distance, he heard the sound of breaking glass and heard a scream and a faint voice say, "Where's Steve?" Someone else said, "Steve Who?", and the voice replied, "Steve Potts."

Shortly after Kathy was overtaken and passed by the defendant's truck, she met two men walking in the opposite direction. After they passed, she was struck in the face. She was rendered semi-conscious but heard someone say "Go to the barn." Two men got her inside a nearby barn and told her to take off her pants. She refused and was struck in the face again, and she fell to the ground. One of the men, then removed her pants and raped her. The other then attempted to rape her but was unable to penetrate her, whereupon he compelled her to perform fellatio upon him.

There was a horse in the barn, and after the foregoing described acts had been completed, one of the men held it and kept it quiet, and the other held her and forced her to perform fellatio upon it. During the episode, Kathy bled profusely from the wound she had received when she was struck in the face.

The men departed, leaving Kathy in the barn. When she was sure that they had gone, she made her way to a farmhouse and was taken home by the couple who resided there.

The police investigation conducted the following day produced broken glass from a beer bottle and a pool of blood nearby, both in the roadway near the barn. Kathy's spectacles, with a broken lens, and one of her earrings were also found there. Inside the barn, Kathy's underpants and a blood soaked mat were found.

\* \* \* \* \* \*

## ISSUE I

Defendant's challenge to the sufficiency of the evidence is dual. With respect to all charges, he cites his assertedly unrefuted alibi and the failure of the prosecutrix to make an unqualified identification of him, as one of her assailants, from the witness stand. Secondly, he asserts that even if the evidence is deemed to be sufficient to sustain a finding that he was one of the assailants, it nevertheless was not sufficient to sustain findings that *he* used deadly force, so as to render the attempted rape a Class A felony, or that *he* inflicted serious bodily injury upon the prosecutrix, so as to render the battery a Class C felony, or that *he*

committed any act which intimidated her into performing fellatio upon the horse.

As to Defendant's assertion that the evidence was insufficient to identify him as one of the assailants, he directs our attention to certain circumstances and, although admitting that they are incriminating, contends that they, nevertheless, are insufficient under the "reasonable doubt" standards of *Gaddis v. State,* (1969) 253 Ind. 73, 251 N.E.2d 658, *Lottie v. State,* (1974) 262 Ind. 124, 311 N.E.2d 800, and *Harris v. State,* (1974) 258 Ind. 341, 281 N.E.2d 85. Such incriminating circumstances are acknowledged by him, as follows:

"The circumstantial facts connecting the defendant to this crime are as follows:
"1. He was at the scene of the crime.
"2. The day after the attack he was with a man who was identified as one of the attackers.
"3. When arrested, he was seen coming out of the bathroom zipping up his sweatshirt. He had a T-shirt on when he went in the bathroom. He didn't have one on when he came out.
"4. The defendant had no underwear on when searched at the jail.
"5. The underwear had blood stains on it. They were the same type as the blood of the victim." Defendant's brief at pp. 21, 22. (citations to record omitted)

We agree that no one of such circumstances would suffice, but Defendant has ignored the impact of such circumstances when considered together and with other circumstances disclosed by the evidence but not mentioned by him, the totality of which were quite sufficient to warrant the jury in finding, beyond a reasonable doubt under the standards enunciated by the aforementioned cases and long recognized by this Court, that Isaacs and Defendant were Kathy's assailants, and in disbelieving Defendant's testimony that he had gone to sleep or passed out from too much alcoholic drink immediately after Kathy, Isaacs and Potts got out of the truck and had not awakened until the following morning.

From the evidence hereinbefore recited, a reasonable, if not inescapable, conclusion is that Kathy was assaulted and abused by two of her three companions, the defendant, Isaacs and Potts. She positively identified Isaacs as the one who raped her, having been able to see him, although not the defendant, during and immediately following the incident. Additionally, Isaacs admitted to the rape.

Immediately prior to his arrest on the morning following the criminal incident, Defendant went into the lavatory of a tavern. He was observed to be then wearing a T-shirt, but when he exited, he was wearing none; and when he was searched at the police station, he was wearing neither under shorts nor under shirt. Shortly after Defendant exited from the lavatory, a man's T-shirt and undershorts were found there and were removed to the trash can behind the tavern. Later that morning, the garments were removed from the trash by the police. Tests revealed that they were stained with blood of the same type as Kathy's blood. Although Kathy's blood was of the most common type and although hairs found upon the undergarments were determined to be from Isaacs rather than from the defendant, these circumstances give rise to a logical conclusion that Defendant had attempted to dispose of evidence of the crime.

Potts testified as to his role in the events of the evening, and for the most part, his testimony corroborated much of Kathy's and refuted much of the defendant's.

When Kathy was first attacked, she said "Where is Steve?" and, although she could not see the assailants, she heard one respond, "Steve, who?" and the other answer, "That guy was with us" (sic). This brief exchange evidences that neither of the two was Steve Potts and leads to the ultimate conclusion that the two were Isaacs and the defendant.

Although Kathy was forthright and adamant in her testimony that she did not see the face of the defendant, after she left the truck and, therefore, testified that she could not positively identify him as one of the assailants, the totality of the evidence is

compelling that he was. Additionally, a most damning bit of evidence that Defendant has omitted from his synopsis, is Kathy's testimony that while she and her assailants were in the barn, she recognized Defendant's voice.

Other than to involve issues of identity, the defendant's case bears no resemblance to his cited cases of *Gaddis, supra, Lottie, supra,* or *Harris, supra,* the circumstantial evidence of his case being more than merely sufficient to overcome the fact that Kathy could not testify that she saw and recognized Defendant during the attack.

■ It must also be noted that after relating all the events leading up to the attack, Kathy testified that she had told the police that her attackers were "Terry and Charles," (Tr. p. 627) and that her (at trial) testimony was the same. Although this was an expression of an opinion that invaded the province of the jury, it was admitted without objection, and the jury was, therefore, allowed to consider it.

■ It is apparent from an examination of all the evidence that Defendant's argument ignores highly inculpating evidence which places him at the scene of the sexual assault after having requested, then cajoled, and finally implicitly threatened the prosecutrix, who steadfastly refused to engage in sexual intercourse with him. Contrary to Defendant's claim, this is not a case where one's presence at the scene of the crime was the only incriminating circumstance. *Eg., Janigon v. State,* (1982) Ind., 429 N.E.2d 959. Moreover, under our standard of review for sufficiency challenges, we cannot, as Defendant would have us to do, draw the assertedly "logical" inferences from the evidence that Isaacs and not Defendant was the true assailant, nor may we assume that the jury credited Defendant's alibi. The evidence of motive, opportunity, the Prosecutrix's conclusion, and the reasonable inference that Defendant had attempted, on the day after the assault, to conceal garments, which contained blood matching the Prosecutrix's blood type, constituted ample evidence from which the jury could reasonably have inferred that

Defendant was one of the assailants. *See Napier v. State,* (1983) Ind., 445 N.E.2d 1361 at 1367; *Wheeler v. State,* (1970) 255 Ind. 395, 402, 264 N.E.2d 600, 604; *Rogers v. State,* (1974) 257 Ark. 144, 155, 515 S.W.2d 79, 86, *cert. denied,* (1975) 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87; *Green v. State,* (1974) Tex.Cr.App., 505 S.W.2d 292.

■ Defendant's alternative challenge to the sufficiency of the evidence is without merit. Although Defendant was charged as a principal, the State could convict him as an accessory or aider and abettor, *Coleman v. State,* (1976) 265 Ind. 357, 361, 354 N.E.2d 232, 235, or as a coconspirator. *Wallace v. State,* (1981) Ind., 426 N.E.2d 34, 44. The evidence clearly discloses that Defendant and Isaacs acted in consort throughout the criminal episode.

## ISSUE II

■ Defendant contends that the aforementioned men's undergarments were erroneously admitted into evidence because they had not been sufficiently connected to him. Again, his argument focuses upon the absence of direct testimony that the garments were either his or the same as those that had been found in the tavern lavatory and ignores the circumstantial evidence from which it could be reasonably concluded that the garments that had been removed from the trash can were the same as those that had been found in the lavatory and that they had been abandoned there by him. The foundation for their admission, therefore, was adequate. Assuming arguendo, that the garments were erroneously admitted, however, their admission was harmless, as they were exhibits that were merely cumulative of the unrefuted inculpatory testimony that had preceded their admission and been admitted without objection. *Walton v. State,* (1980) Ind., 398 N.E.2d 667, 670.

## ISSUE III

The evidence most favorable to the State reveals that Defendant and Terry Isaacs assaulted the prosecutrix, who had departed

from Defendant's truck in the middle of the night, after she had repeatedly refused their sexual overtures. In the course of the attack, Isaacs raped the prosecutrix and Defendant attempted to rape her, and both men forced her to perform fellatio upon a horse.

On October 12, 1979, within hours after the assault, the prosecutrix gave a statement to the police in which she identified Isaacs as one of her assailants and a "Charlie" as the other assailant. The parties refer to subsequent depositions of the prosecutrix; however, they do not appear in the record, though they may have been referred to in Defendant's motion to suppress the prosecutrix's testimony:

"The witness had been placed under hypnosis on the 23rd day of January, 1980 by Sheriff James Caldwell. To allow the witness to testify would violate the defendant's right to confront the witnesses testifying against him guaranteed by the 6th Amendment to the Constitution of the United States; it would further violate the defendant's right to due process and Equal Protection guaranteed by the 14th Amendment to the Constitution of the United States. See attached memorandum.

"WHEREFORE, the defendant moves, by counsel to suppress all testimony of the witness (prosecutrix) or, in the alternative to allow the witness to testify consistent (sic) with her statements made prior to the hypnosis." R. at 152

■ We note that Defendant's prayer for relief is in the alternative. To the extent that it sought the suppression of all of the Prosecutrix's testimony, it was too broad. This State does not apply a per se exclusion to testimony from witnesses after they have undergone hypnosis for investigation purposes. *Pearson v. State,* (1982) Ind., 441 N.E.2d 468; *Morgan v. State,* (1983) Ind.App., 445 N.E.2d 585, 587. Additionally, Defendant does not explain why the Prosecutrix was incompetent to relate the corpus delecti of the charges. *Forrester v. State,* (1982) Ind., 440 N.E.2d 475, 481. Additional direct and circumstantial evidence partially corroborated her testimony upon this issue.

■ The hypnotic session was conducted in a fashion which we have disapproved, *Pearson, supra,* at p. 473, and it appears that the taint therefrom which could logically have been anticipated did, in fact, materialize. The record contains a transcript of the session which reveals that Kathy had previously been equivocal when asked to identify her assailants but, under hypnosis was unequivocal in her identification of Defendant and Isaacs. At trial, however, her equivocation resurfaced, and she was reluctant to swear that Defendant was one of the culprits, because she had not seen his face at the time. She, nevertheless, did testify on redirect examination, that she could tell "who it was" at the time by their voices.

This testimony was entirely consistent with the statement which she had given to the police prior to her having been hypnotized. Her description of the assailant, other than Isaacs, he having been positively identified, did not match exactly the defendant's physical characteristics; but she had concluded that the other one was "Charles" or "Charlie" (the defendant) with whom she had spent much of the evening. At trial she related the same information that she had initially related to the police and drew therefrom the same conclusion, i.e., that the second assailant was the defendant. Consequently, although the court had erroneously denied the alternative relief sought by the motion to suppress, (which we liberally construe to be the suppression of testimony that was the product of the hypnosis) no such evidence was forthcoming. The testimony derived at trial conformed to the statement given to the police prior to the hypnosis. Hence we may safely conclude that it was not the product of or tainted by it. The error, therefore, was harmless.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C.J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.